Argued and submitted September 8, accused suspended from the practice of law for 90 days, effective 60 days from the date of filing of this decision December 26, 2003

## In re Complaint as to the Conduct of

### ANTHONY L. WORTH,
*Accused.*

(OSB 99-125, 99-126, 99-127, 99-128, 00-149; SC S49861)

82 P3d 605

Jane E. Angus, Assistant Disciplinary Counsel, Lake Oswego, argued the cause for the Oregon State Bar. With her on the briefs was Martin E. Hansen, Bar Counsel.

Jonel K. Ricker, of Ricker & Roberson, La Grande, argued the cause and filed the brief for the accused.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) alleges that Anthony L. Worth (the accused) violated several Code of Professional Responsibility Disciplinary Rules in his handling of five post-conviction relief (PCR) cases and in responding to the Bar's inquiries.

In three matters (Elder, Tompkins, and Crescenzi), the Bar charged violations of Disciplinary Rule (DR) 1-102(A)(4) (conduct prejudicial to administration of justice) and DR 6-101(B) (neglect of legal matter). In the fourth matter (Schultz), the Bar charged violations of DR 1-102(A)(4); DR 2-110(B)(2) (failure to withdraw); DR 6-101(B); and DR 7-101(A)(2) (intentional failure to carry out contract of employment). In the fifth matter (Thompson), the Bar charged violations of DR 6-101(B) and DR 9-101(C)(4) (failure to return client property). Finally, the Bar charged violations of DR 1-102 (A)(3) (conduct involving deceit or misrepresentation) and DR 1-103(C) (noncooperation with disciplinary investigation) based on the manner in which the accused responded to the Bar's inquiries.

A trial panel of the Disciplinary Board concluded that the accused violated DR 6-101(B) in his handling of the Elder, Tompkins, and Crescenzi matters, and violated DR 2-110(B)(2) by failing to withdraw from the Schultz matter. The trial panel concluded that the Bar failed to prove the other charges and dismissed them. The trial panel imposed a public reprimand, and the Bar sought review.

In this court the Bar contends that, in addition to determining that the accused violated DR 6-101(B) and DR 2-110(B)(2), the trial panel also should have concluded that the accused violated DR 1-102(A)(3), DR 1-102(A)(4), DR 1-103(C), DR 7-101(A)(2), and DR 9-101(C)(4) in his handling of the various client matters. The Bar argues that, because the accused committed multiple serious violations of the disciplinary rules, a public reprimand is not an appropriate sanction. Rather, the Bar contends, the accused should receive a two-year suspension.

The accused does not dispute the trial panel's conclusions that he violated DR 6-101(B) in the Elder, Tompkins,

and Crescenzi matters, and DR 2-110(B)(2) in the Schultz matter. However, he argues that this court should uphold the trial panel's conclusions with respect to the other allegations and that a public reprimand is the appropriate sanction for his misconduct.

■■ When a party seeks review of the trial panel's decision, this court's review is mandatory and *de novo*. ORS 9.536(2), (3); Bar Rule of Procedure (BR) 10.6; *In re Eakin*, 334 Or 238, 240, 48 P3d 147 (2002). The Bar must establish the alleged misconduct by clear and convincing evidence. BR 5.2. "Clear and convincing evidence means evidence establishing that the truth of the facts asserted is highly probable." *Eakin*, 334 Or at 240.

## I. FACTS

The accused has been a lawyer since 1965. He was admitted to practice law in Oregon in 1989. His practice primarily has been as a legal aid lawyer and administrator. He does not have a prior disciplinary record.

In November 1998, the accused formed a law partnership with Ehmann.[1] Ehmann previously had formed NECO Public Defender, Inc. (NECO), a consortium of lawyers that defended indigent clients. NECO had a contract with the Indigent Defense Services Division (IDS) of the State Court Administrator's Office to accept court appointments for the period between September 1, 1998 and June 30, 2000. Through that contract, Ehmann, as NECO's administrator, received notices of appointment and assigned cases to consortium lawyers, including the accused. The partnership had access to the Oregon Judicial Information Network (OJIN) and could track its cases from its office.

Even though the accused had limited experience handling PCR cases,[2] Ehmann and the accused agreed that

---

[1] The Bar also charged Ehmann with multiple disciplinary rule violations. The Bar's allegations regarding the handling of the Elder, Schultz, Crescenzi, and Tompkins matters were common to both the accused and Ehmann. The Bar also charged Ehmann with misconduct in two other matters. The trial panel tried the accused and Ehmann together and disbarred Ehmann. Ehmann subsequently submitted, and this court accepted, a Form B resignation.

[2] The accused read a Continuing Legal Education publication on PCR cases, and Ehmann offered to provide the accused with other necessary guidance in handling such cases.

the accused would handle all the PCR and habeas corpus cases that IDS assigned to NECO after November 1, 1998.[3] They also agreed that Ehmann would continue to handle the PCR cases that he previously had assigned to himself until the accused became accustomed to his new caseload.

The contract between NECO and IDS contemplated that, between September 1, 1998 and June 30, 1999, IDS would assign 28 PCR cases and 17 habeas corpus cases to NECO. During that time period, IDS actually assigned NECO 34 PCR cases and seven habeas corpus cases. The contract also required "prompt notification to the court of the specific lawyer assigned to each case." The accused did not read the contract between NECO and IDS.

In addition to his responsibility for all the PCR cases that IDS assigned to NECO, the accused handled several other civil matters that required a great deal of time and attention. Among other things, the accused worked as the staff lawyer for Domestic Violence Services of Umatilla and Morrow counties, and represented clients in several Social Security disability cases.

In mid-December 1998, due to a dispute with the Eastern Oregon Correctional Institution, Ehmann decided not to return to the prison to see clients. He therefore reassigned eight PCR cases to the accused—including the Elder, Schultz, Crescenzi, and Tompkins cases. The accused immediately assumed responsibility for the cases, but neither lawyer promptly notified the Umatilla County Circuit Court, which had appointed Ehmann as counsel in each of the cases, of the change.[4]

A short time after Ehmann reassigned the cases, the trial court sent Ehmann notices of intent to dismiss the Elder, Tompkins, and Crescenzi cases in 30 days if no action was taken on the cases.[5] At that point, Ehmann also had

---

[3] The record reveals that, in Umatilla County, prisoners typically initiate PCR proceedings by filing preprinted forms that the prison makes available to them. The prisoners fill out the forms and file them with the trial court. The trial court then appoints a lawyer to represent the prisoner. Ordinarily, that lawyer files an amended petition for PCR within 30 days of the appointment.

[4] The accused testified that the practice was to "just show[ ] up and [say] to the judge, well, I'm going to be handling this case."

[5] Jones, the Trial Court Administrator for the Sixth Judicial District, which includes Umatilla County, testified that, if there is no action on a case for 30 days,

requested several extensions of time and continuances in the Schultz case. Neither Ehmann nor the accused had filed amended petitions for PCR in any of the reassigned cases.

The trial court appointed NECO to represent Thompson in late December 1998, and the accused became Thompson's lawyer on January 4, 1999. The accused sent Thompson a letter that identified him as Thompson's lawyer and that explained how the accused planned to proceed with the case. The accused also filed a motion for extension of time to file the amended petition for PCR. He planned to leave for a month-long vacation to Arizona during the last week of January 1999.[6]

At the end of January 1999, the trial court dismissed the Elder and Tompkins cases.[7] However, in the first week of February 1999, Ehmann filed motions to reinstate those cases, and the trial court granted the motions. In late January, Ehmann also filed a motion for continuance in the Schultz case on the accused's behalf.

During the second week of February 1999, the trial court generated another notice of intent to dismiss the Crescenzi case. At that point, Ehmann expected the accused to return from his vacation within the next two weeks, so he did nothing on the case. When the accused returned from Arizona during the last week of February 1999, he was ill with the flu and missed another two weeks of work. The accused did not check the status of his cases immediately.

---

his office sends a notice of intent to dismiss. The notices of intent to dismiss give the lawyer another 30 days to avoid that outcome. Jones also testified that the repeated dismissal and reinstatement of PCR cases increases the workload of the individuals who process the already high volume of PCR cases in the Umatilla County Circuit Court. Circuit Court Judge Murgo also provided consistent testimony about that issue.

[6] Ehmann and the accused had been friends for many years. Ehmann was aware that the accused took annual trips to Arizona and agreed to cover the accused's cases while the accused was away.

[7] Judge Murgo testified that the publication of notices of intent to dismiss is common, but that actual dismissals are rare because most lawyers take action to avoid that outcome.

In the first week of March 1999, Ryan, an analyst with IDS, asked the accused why he was representing Crescenzi when the IDS contract did not authorize him to represent clients who had been convicted of murder. Because the accused had not read the contract between NECO and IDS, he was surprised to learn that he could not represent Crescenzi. He immediately returned the file to Ehmann, but Ehmann failed to reassign the case before the trial court dismissed it at the end of March 1999. The accused subsequently filed a motion to have the case reinstated, and the trial court granted that motion.

The accused failed to notify Crescenzi of the reinstatement. As a result, Crescenzi appealed the dismissal of his case. The appeal deprived the trial court of its jurisdiction over the case and, even though the appeal later was dismissed, significantly delayed reinstatement of the PCR proceeding. The trial court reassigned the case to another lawyer in June 1999.

During the second week of March 1999, the trial court again issued notices of intent to dismiss the Elder and Tompkins cases and, at the end of April 1999, the court dismissed the cases a second time.[8] The accused told neither Elder nor Tompkins that he planned to file motions to have their cases reinstated. Like Crescenzi, Elder and Tompkins independently appealed the second dismissal of their cases, which removed the trial court's jurisdiction. The trial court therefore denied the motions. The Court of Appeals eventually dismissed the Elder and Tompkins appeals, and remanded the cases to the trial court.[9] The accused withdrew from representing Elder in March 2000, while Tompkins' appellate counsel continued to represent Tompkins in the reinstated PCR case.

---

[8] The trial court sent the notices pursuant to UTCR 7.020, which requires the filing of a return or acceptance of service on the defendant within 63 days of the filing of a complaint. If the plaintiff violates that requirement, the trial court issues a notice of pending dismissal that gives the plaintiff 28 days from the date of mailing to take action to avoid dismissal.

[9] Some time passed during the appeals, and the Court of Appeals did not remand the cases to the trial court until late 1999.

The trial court also generated notices of intent to dismiss the Thompson case in March 1999 and the Schultz case in June 1999. The accused managed to avert dismissal in both cases. He filed an amended petition for PCR on behalf of Thompson in July 1999. By that time, however, Thompson had become unhappy with the accused's representation and filed a motion for new counsel with the trial court. The accused subsequently filed a motion to withdraw, and the trial court appointed new counsel to represent Thompson in January 2000.

During the last week of June 1999, two weeks after the trial court sent the notice of intent to dismiss the Schultz case, the respondent in that case filed a motion to dismiss the case. The accused filed a motion to continue the case in July. The trial court granted the accused's motion, but he ultimately failed to respond to the motion to dismiss. Schultz also became unhappy with the accused and filed a motion for new counsel in August 1999. The trial court replaced the accused with other counsel in October 1999.

During the occurrence of those events, the accused and Ehmann's law partnership changed secretaries. The new secretary, Price, began working for the firm at the end of March 1999. When she started, Price immediately looked at the firm's files to become familiar with them and with the deadlines associated with each case. She implemented a system for keeping track of cases and also checked OJIN. When she first checked OJIN, she discovered that some of the firm's cases were pending dismissal and that the trial court had dismissed at least five cases. She immediately brought that to the firm's attention.

Price dealt primarily with PCR cases and found herself drafting motions for extension of time and for reinstatement, with the accused merely signing them. The firm also authorized her to read attorney correspondence. When letters came in addressed to one lawyer or the other, she read them and then placed them in the appropriate lawyer's mailbox. The accused responded to some of the letters that were addressed to him.

The accused neither filed an amended petition for PCR in the Elder, Schultz, Crescenzi, or Tompkins cases, nor

did any substantive work on the cases. He also failed to provide all clients, including Thompson, with copies of notices, pleadings, and orders filed in their cases. The trial court informed Elder, Tompkins, and Crescenzi that their cases had been dismissed.

All five clients filed complaints with the Bar about either Ehmann's or the accused's handling of their cases. None, except Thompson, was clear about who his lawyer was because of Ehmann's earlier involvement, and because the accused did not properly notify the trial court when he assumed responsibility for the cases.[10] They complained generally that the lawyers were not communicating with them and did not fulfill promises about how they would handle the cases. Elder, Tompkins, and Crescenzi complained individually that their lawyer's neglect had caused the trial court to dismiss their cases. Schultz, Crescenzi, and Thompson complained further that the accused briefly visited them only once or twice, and that he repeatedly missed scheduled visits. Thompson also complained that the accused did not return a newspaper article that Thompson gave the accused to help with his case and that Thompson specifically had told the accused that he wanted it returned.

In responding to the Bar's inquiries about his handling of the cases, the accused always was untimely. Even when he requested time extensions, which the Bar always accommodated, he never met the modified deadlines. In some instances, because the accused had not responded, the Bar was forced to make a second request for a response. In at least two instances, the accused responded over one month late, and in one instance, he responded four and one-half months late. The accused repeatedly apologized for his untimely responses and cited his overwhelming caseload as contributing to his inability to respond on time.

In addition, some of the accused's responses to the Bar were incomplete and others were inconsistent. In response to an inquiry about whether he had returned

---

[10] Crescenzi thought that Ehmann was representing him and wrote at least 11 letters addressed to Ehmann, two letters addressed to "Ehmann and Worth," and one letter to the accused. In one letter, Crescenzi asked: "Hello! Is anybody out there?" All the letters went unanswered.

Thompson's article, the accused stated in one letter that he was certain that he had met with Thompson and returned the article. In another letter, however, he stated:

> "* * * Mr. Thompson may be accurate in that based on the press of other business, including forty plus PCRs, I may well have neglected to copy his newspaper article and send it back to him. I continue to insist that the newspaper was impertinent [sic] to the case, and I acknowledge that Mr. Thompson attaches much more importance to it than I do."

During the course of its investigation, the Bar found the article that Thompson had given the accused in the file that the accused maintained for Thompson's case.[11] At the hearing before the trial panel, the accused explained that he had made a copy of what Thompson had given him and returned the copy. Thompson steadfastly claimed that the accused had not returned the article.

The accused also gave inconsistent responses regarding whether he ever obtained Thompson's sentencing transcript. In one letter dated November 9, 1999, the accused stated:

> "* * * I explained to [Thompson] what I was doing, I told him that I was having difficulties getting any response from Mr. Bowman, his trial counsel and that I had not received any transcripts.
>
> "I subsequently received the sentencing transcript and after recovering from a two month illness[12] in February and March of this year, I filed a Formal Petition in July[.]"

The Bar sent a copy of that letter to Thompson. In a subsequent letter to the Bar dated January 2, 2000, Thompson disputed the accused's statement about having received the transcript. In that letter, Thompson recalled that, during a December 9, 1999, meeting, the accused told Thompson that he had not yet received a copy of Thompson's sentencing transcript and would have to file a motion with the trial court

---

[11] To facilitate its investigation, the Bar required the accused to give the Bar the files that he maintained for each client.

[12] The accused testified before the trial panel that the illness he experienced at the end of his vacation in late February 1999 caused him to miss about two weeks of work.

to obtain it. The Bar sent the accused a copy of Thompson's letter and, in a letter dated January 17, 2000, the accused stated:

> "Mr. Thompson is correct that I indicated that I did not like to file motions for the production of transcripts at State expense because I firmly believe that transcripts exist in the public defender's office or in the record of the Court of Appeals and that it would be pointless to spend public money for a second transcript. I have endeavored to get a copy of the transcript from the public defender's office, but with a singular lack of success."

At the hearing before the trial panel, the accused stated that he "did not receive or review the transcript."[13]

At various times, the accused has suffered from health problems that have affected his ability to do his work. He is diabetic and has impaired vision, and he has suffered from recurring depression and anxiety since 1993. His depression and anxiety worsened when he took on the PCR caseload, because his overall caseload increased. In January 2000, the accused's emotional problems led him to request that the presiding judge relieve him from further court appointments. The accused's mother also became terminally ill in April 1999, and that illness caused the accused to miss periods of work in April and October 1999. The accused's mother died in May 2000.

During the hearing before the trial panel, the accused acknowledged responsibility for the cases and acknowledged that he did not fulfill all his responsibilities in handling the cases. There also was favorable testimony on his behalf. Nicholson, Executive Director of Domestic Violence Services of Umatilla and Morrow counties, testified that the accused had done invaluable work as a staff lawyer for that organization. She testified that he always fulfilled his responsibilities and that she had not received any complaints about his work. She testified further that Domestic Violence Services had nominated the accused for the

---

[13] The accused also exhibited negative feelings toward his clients in some of his responses to the Bar. In one letter, he stated that "[m]y license is in law, not baby-sitting." In another, he stated that a client's "dissatisfaction seems to be more a matter of not having his hand held than anything else."

National Crime Victims Service Award, an award given only to those whose level of community service has made an impact. Entelman, an administrative law judge before whom the accused had handled several Social Security disability cases, testified that the accused was one of the top three or four lawyers that he had seen practice before him.

## II. PROCEDURAL HISTORY

After a hearing that lasted five days and that involved testimony from 23 witnesses, the trial panel concluded that the accused had been neglectful in handling his cases, but that Ehmann had abandoned the accused, contrary to Ehmann's initial promise to provide the accused guidance in handling PCR cases.

The trial panel also concluded that the accused had been cooperative with the Bar's investigation and that the Bar failed to prove that the accused made willful misrepresentations in his responses to the Bar's inquiries. The trial panel interpreted DR 1-103(C) to require full and truthful responses to Bar inquiries, but not timely ones. It concluded that the accused violated DR 6-101(B) in the Elder, Tompkins, and Crescenzi cases, and that he violated DR 2-110(B) in the Schultz case.

In determining the appropriate sanction, the trial panel recognized that the accused violated his duty to do substantive work for and to communicate with his clients, but it considered as mitigating circumstances his lack of a prior disciplinary record, his personal and physical problems, his cooperative attitude, his apparent lack of a selfish motive, and his good character and reputation. The trial panel determined that the appropriate sanction was a public reprimand. The Bar sought review because it disagreed with the trial panel's conclusions and the sanction that it imposed.

We agree with the trial panel's conclusion that the Bar did not prove by clear and convincing evidence that the accused violated DR 1-102(A)(4), DR 6-101(B), and DR 7-101(A)(2) in the Schultz matter, or DR 6-101(B) in the Thompson matter. For the reasons that follow, however, we conclude that, in addition to the violations found by the trial panel, the accused also violated DR 1-102(A)(4) in the Elder,

Tompkins, and Crescenzi matters, DR 9-101(C)(4) when he failed to return the newspaper article to Thompson, and DR 1-102(A)(3) and DR 1-103(C) based on the manner in which he responded to some of the Bar's inquiries.

## III. DISCUSSION

### A. *The Elder, Tompkins, and Crescenzi Matters*

The Bar argues that, in his handling of those client matters, the accused violated DR 1-102(A)(4). DR 1-102(A)(4) provides that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct that is prejudicial to the administration of justice[.]" In *In re Kluge*, 335 Or 326, 345, 66 P3d 492 (2003), this court explained that

"[t]o establish a violation of DR 1-102(A)(4), the Bar must show that (1) the accused lawyer's action or inaction was improper; (2) the accused lawyer's conduct occurred during the course of a judicial proceeding or a proceeding with the trappings of a judicial proceeding; and (3) the accused lawyer's conduct had or could have had a prejudicial effect upon the administration of justice. The administration of justice includes both the procedural functioning of the proceeding and the substantive interests of parties to the proceeding. Prejudice may arise from several acts that cause some harm or a single act that causes substantial harm to the administration of justice."

(Internal citations omitted.) The rule also applies to the manner in which a lawyer handles his or her own client's case. *See In re Haws*, 310 Or 741, 746-47, 801 P2d 818 (1990) (applying rule to lawyer's handling of client's case).

In *In re Crist*, 327 Or 609, 614, 965 P2d 1023 (1998), this court concluded that an arbitrator licensed to practice law who repeatedly missed deadlines, failed to communicate with or respond to the parties, and who did not respond to requests by the trial court violated DR 1-102(A)(4). Similarly, in *In re Gresham*, 318 Or 162, 166, 864 P2d 360 (1993), this court concluded that a probate lawyer who took an extended period of time to close an estate and who repeatedly failed to "do anything to administer the estate," requiring the trial court to make repeated requests for information, violated the rule.

Here, the trial panel concluded, without explana-
tion, that the accused did not violate DR 1-102(A)(4) in his
handling of the Elder, Tompkins, and Crescenzi cases. The
Bar argues that, by neglecting those cases to the extent that
he did, the accused unnecessarily and repeatedly burdened
the trial court and jeopardized his clients' substantive inter-
ests by failing to pay attention, to communicate, or to take
action.

The accused attributes the case dismissals generally
to not receiving notice from either the trial court or from
Ehmann, to whom the trial court had addressed documents
related to the cases. He also blames his overwhelming case-
load and his clerical staff's failure to implement properly his
"tickle" system, which would have alerted him to important
deadlines. The accused also asserts that, in any event, his
failures did not prejudice his clients because the trial court
eventually reinstated the cases.[14]

We agree with the Bar. When Ehmann reassigned
the Elder, Tompkins, and Crescenzi cases to the accused, the
accused immediately became responsible for those cases.
NECO's contract with IDS required the accused "promptly"
to inform the trial court that he would be handling the cases
from that point forward. The accused did not read the con-
tract between IDS and NECO, and was not aware of that
requirement. A competent, careful lawyer under similar cir-
cumstances would have read the contract. Had the accused
read the contract and properly notified the trial court, he per-
sonally would have received the notices that he claims he did
not receive. Even so, the accused could access OJIN from his
office and should have checked OJIN to determine the status
of his cases, especially after he returned from his month-long
vacation.

The accused's failure to read the contract with IDS,
his failure to monitor his cases properly, and his failure to
communicate with his clients caused avoidable dismissals

---

[14] More specifically, in Elder's case, the accused cites the eventual denial of
post-conviction relief. In Crescenzi's case, he cites his lack of authorization to han-
dle the case and Ehmann's failures both to instruct the accused on the appropriate
procedures to withdraw as counsel and to reassign the case before it was dismissed.
In Tompkins's case, the accused cites Tompkins's decision to drop the case.

and delays in the Elder, Tompkins, and Crescenzi cases. The multiple dismissals and delays evidenced a pattern of misconduct that harmed the procedural functioning of the judicial system. The dismissals increased the trial court's workload and forced the accused's clients to seek other counsel to file appeals. The accused's failures to act also potentially prejudiced his clients' substantive interests. The Umatilla County Circuit Court was free to deny reinstatement of the cases, especially after it had dismissed the Elder and Tompkins cases a second time.

Based on our own *de novo* review of the record, we conclude that the accused violated DR 1-102(A)(4) in his handling of the Elder, Tompkins, and Crescenzi matters.

B. *The Thompson Matter*

The Bar argues that, in his handling of the Thompson matter, the accused also violated DR 9-101(C)(4) by failing to return Thompson's newspaper article.

■ DR 9-101(C)(4) provides, in part, that "[a] lawyer shall * * * [p]romptly pay or deliver to a client as requested by the client the funds, securities or other properties in the possession of the lawyer which the client is entitled to receive." A lawyer violates the rule by failing to return a client's files or other documents of importance to the client when asked to do so. *See In re Devers*, 317 Or 261, 265, 855 P2d 617 (1993) (concluding lawyer violated rule by failing to return client files when asked); *In re Spies*, 316 Or 530, 534-35, 852 P2d 831 (1993) (quoting *In re Arbuckle*, 308 Or 135, 138, 775 P2d 832 (1989), which explains that "client is entitled to the return of the client's property upon demand").

The trial panel concluded, without explanation, that the accused did not violate this rule. We disagree.

■ The accused's inconsistent responses to the Bar's inquiries about Thompson's article, Thompson's adamant denial that the accused returned the article, and the fact that the Bar found the article in Thompson's file are all factors that indicate that the accused did not return Thompson's article. Indeed, the accused minimized the importance of the article and exhibited an inability to understand why the article was important to Thompson. We conclude that the Bar

has established by clear and convincing evidence that the accused did not return Thompson's article and that, in failing to do so, he violated DR 9-101(C)(4).

## C. *The Bar's Investigation*

The Bar argues that the accused violated DR 1-102(A)(3) and DR 1-103(C) because he made misrepresentations in his responses to its inquiries and because his responses were dilatory.

### 1. *DR 1-102(A)(3)*

DR 1-102(A)(3) provides, in part, that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" In *In re Gatti*, 330 Or 517, 527-28, 8 P3d 996 (2000), this court explained that

> "[m]isrepresentation is a broad term that encompasses the nondisclosure of a material fact. A misrepresentation may be a lie, a half-truth, or even silence. A material fact consists of information that, if disclosed, would have influenced the recipient's conduct. Even a misrepresentation that is made with the best of intentions can be a misrepresentation under DR 1-102(A)(3)."

(Internal citations omitted.) The Bar must prove that the lawyer knowingly misrepresented a material fact to establish a violation of the rule. *See id.* "A lawyer acts knowingly by being consciously aware of the nature or attendant circumstances of the conduct, but not having a conscious objective to accomplish a particular result." *In re Lawrence*, 332 Or 502, 513, 31 P3d 1078 (2001); ABA Standards at 7.

The trial panel concluded, without discussion, that the Bar did not prove that the accused made willful misrepresentations and, thus, that the accused did not violate DR 1-102(A)(3). The trial panel, however, applied the incorrect mental state to determine whether the accused violated DR 1-102(A)(3). As stated above, to prove a violation of that rule, the Bar must show by clear and convincing evidence that the accused "knowingly" made misrepresentations, not that he "willfully" did so. The trial panel therefore did not properly conclude that the accused did not violate DR 1-102(A)(3).

■ In its amended formal complaint, the Bar, in compliance with BR 4.1,[15] pleaded only the acts and omissions of the accused and the disciplinary rules that it alleged that he violated. The Bar did not plead the required mental state and it was not required to do so. BR 4.1; *see In re Kluge*, 332 Or 251, 262, 27 P3d 108 (2001) (so stating). The record does not indicate why the trial panel applied the "willful" mental state, but it apparently felt bound to do so.

By applying that mental state, the trial panel required the Bar to prove a more egregious mental state than is required, because this court has recognized that "willful" is synonymous with "intentional." *See In re Morris*, 326 Or 493, 501, 953 P2d 387 (1998) (observing that statute prohibiting lawyer from "willfully" engaging in particular conduct required lawyer to act intentionally to be subject to discipline under statute). To prove that the accused acted intentionally, the Bar would have been required to show that the accused acted with "the conscious objective or purpose to accomplish a particular result," rather than with "the conscious awareness of the nature * * * of the conduct but *without* the conscious objective * * * to accomplish a particular result." ABA Standards at 7 (emphasis added). Because the trial panel applied the incorrect mental state, we do not know whether it would have concluded that the accused knowingly made misrepresentations to the Bar. We therefore must make that determination ourselves.

■ The Bar argues that the accused violated DR 1-102(A)(3) by misrepresenting, during the Bar's investigation, that he had visited with Thompson at times that Thompson claims that he did not, that he had returned Thompson's article, and that he had received Thompson's sentencing transcript. For the reasons that follow, we conclude that the accused misrepresented his receipt of Thompson's sentencing transcript in violation of DR 1-102(A)(3).

In response to the Bar's inquiries about the work that the accused had performed on Thompson's case, the

---

[15] BR 4.1 sets out the procedures for filing formal Bar complaints and delineates the required substance of those complaints.

accused told the Bar that he had received Thompson's sentencing transcript and implied that he had used the transcript to prepare Thompson's amended petition for PCR. The accused had not in fact received the transcript, and his representation that he did was false. The accused also made that representation in response to the Bar's investigation into whether, among other things, the accused had neglected Thompson's case. If true, that representation would have affected the Bar's evaluation of the accused's alleged misconduct in his handling of Thompson's case. The representation about the article therefore was material. Furthermore, the accused's response to the Bar, after the Bar confronted him with Thompson's letter, indicated that he was in the habit of obtaining transcripts from the public defender's office and that he had made a significant effort to obtain Thompson's sentencing transcript, but was unsuccessful. If the accused went to such great lengths and was still unsuccessful in obtaining the transcript, he likely would have remembered those efforts when he gave his initial response to the Bar stating that he, in fact, had received the transcript. We conclude that, by initially representing to the Bar that he had received Thompson's sentencing transcript, the accused knew that he, in fact, had not and that he knowingly indicated otherwise to the Bar.

We conclude that the accused's initial statement to the Bar that he had received Thompson's sentencing transcript constitutes a misrepresentation in violation of DR 1-102(A)(3).

### 2. *DR 1-103(C)*

DR 1-103(C) provides that

> "[a] lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of a tribunal or other authority empowered to investigate or act upon the conduct of lawyers, subject only to the exercise of any applicable right or privilege."

That rule requires complete and truthful responses to reasonable requests for information from the Bar. A reasonable request includes the Bar's reasonable deadlines for a response. *See In re Schaffner*, 323 Or 472, 477, 918 P2d 803

(1996) (concluding lawyer violated rule by failing to respond timely to Bar inquiries). A lawyer cannot escape the reach of the rule when, after initially failing to cooperate fully with the Bar's investigation, he or she later cooperates fully in front of a trial panel. *See In re Rhodes*, 331 Or 231, 237, 13 P3d 512 (2000) (explaining that lawyer's eventual cooperation with local professional responsibility committee did not absolve initial failure to cooperate fully with Bar and committee).

■　The accused's responses to the Bar's inquiries sometimes were incomplete and, in at least one instance, false. The accused also responded to all the Bar's inquiries after the Bar's stated deadlines for a reply had expired. In each instance, the Bar's deadline for a reply was a reasonable one. Contrary to the trial panel's conclusion, we conclude that the accused violated DR 1-103(C) by failing to provide full, truthful, and timely responses to the Bar's inquiries.

## IV.　SANCTION

■■　In determining the appropriate sanction, "we recognize that the purpose of sanctions is not to penalize the accused, but rather to protect the public and the integrity of the legal profession." *In re Glass*, 308 Or 297, 304, 779 P2d 612 (1989). This court relies on the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards), as well as its own cases, for guidance in determining the appropriate sanction for lawyer misconduct. *See Eakin*, 334 Or at 257. The methodology that we follow is to weigh preliminarily: (1) the duty violated; (2) the accused's mental state; and (3) the actual or potential injury. *Id.* "We then examine any aggravating or mitigating circumstances to determine if the sanction should be adjusted." *Id.* Finally, we review the sanctions imposed in prior cases to determine the appropriate sanction for the present case. *See id.* (so stating).

### A.　*Preliminary Analysis*

#### 1.　*The Accused's Violation of DR 2-110(B)(2)*

■　In violating DR 2-110(B)(2), the accused failed in his duty to withdraw from representing Schultz when it was

obvious that he could not pursue Schultz's objectives diligently and thus that his continued representation of Schultz would result in a violation of one or more of the disciplinary rules. Schultz suffered injury from the unnecessary delay that the accused's neglect of his case caused.

■ "[A] lawyer's mental state when engaging in particular conduct may be intentional, knowing, or negligent." *Lawrence*, 332 Or at 510. A lawyer is negligent when he fails "to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." ABA Standards at 7; *In re Dugger*, 334 Or 602, 623, 54 P3d 595 (2002). We conclude that the accused was negligent in failing to withdraw from representing Schultz. The ABA standards suggest that a reprimand is the appropriate sanction for the accused's misconduct under DR 2-110(B)(2). *See* ABA Standard 4.43 (explaining that reprimand appropriate when lawyer not reasonably diligent in representing client and failure to be diligent causes potential injury to client).

### 2. *The Accused's Violations of DR 6-101(B) and DR 1-102(A)(4)*

■ In violating DR 6-101(B) and DR 1-102(A)(4), the accused neglected the Elder, Tompkins, and Crescenzi cases, which led the trial court to dismiss them at various times. The dismissals caused the clients to pursue appeals that caused delays in the proceedings. The accused's neglect wasted both the clients' and court's time and resources. The accused thus failed to fulfill his duties to his clients and to the legal system.

We conclude that the accused's failures were the result of negligence. The accused's negligent conduct caused potential injury to Elder, Tompkins, and Crescenzi's substantive interests. The accused's negligent conduct also caused actual injury to the legal process because, avoidably, the trial court repeatedly dismissed and reinstated his clients' cases. The ABA Standards suggest that a suspension is the appropriate sanction for the accused's misconduct under DR 6-101(B) and that a reprimand is the appropriate sanction for the accused's misconduct under DR 1.102(A)(4). *See* ABA

Standard 4.42 (explaining that suspension appropriate when lawyer engages in pattern of neglect and causes potential injury to client); ABA Standard 6.23 (explaining that reprimand appropriate when lawyer negligently fails to comply with court rules and causes interference with legal proceeding).

### 3. *The Accused's Violation of DR 9-101(C)(4)*

In violating DR 9-101(C)(4), the accused failed to return Thompson's article and therefore failed in his duty to ensure that, when asked to do so by a client, he promptly return client property. We conclude that the accused negligently failed to return the article. Thompson was injured when the accused failed to return his property. The ABA Standards suggest that a reprimand is the appropriate sanction for the accused's misconduct under DR 9-101(C)(4). *See* ABA Standard 4.13 (explaining that reprimand appropriate when lawyer negligent in dealing with client property and causes injury to client).

### 4. *The Accused's Violation of DR 1-102(A)(3)*

In violating DR 1-102(A)(3), the accused knowingly made a false statement to the Bar regarding his receipt and review of Thompson's transcript. In making that statement, the accused failed in his duty not to make misrepresentations to the Bar.

The Bar was injured because of the extra time and effort that was required to investigate further the accused's statements. The legal profession was injured because a lawyer's dishonesty undermines public trust in the profession. The ABA Standards suggest that a suspension is the appropriate sanction for the accused's misconduct under DR 1-102(A)(3). *See* ABA Standard 7.2 (explaining that suspension appropriate when lawyer knowingly engages in conduct that is violation of duty owed to profession and causes injury or potential injury to legal system).

### 5. *The Accused's Violation of DR 1-103(C)*

In violating DR 1-103(C), the accused gave incomplete, untruthful, and untimely responses to the Bar's inquiries. He did not fulfill his duty to respect the Bar's investigatory process by properly responding to the Bar's reasonable requests for information. The accused knowingly submitted untimely, incomplete responses to the Bar's inquiries. He also knowingly misled the Bar about his receipt of Thompson's transcript. Both the Bar and the legal profession were injured by the accused's actions for the reasons stated above. The ABA Standards suggest that a suspension is the appropriate sanction for the accused's misconduct under DR 1-103(C). *See* ABA Standard 7.2 (explaining that suspension appropriate when lawyer knowingly engages in conduct that is violation of duty owed to profession and causes injury or potential injury to the legal system).

### B. *Aggravating and Mitigating Factors*

"[A]ggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed." ABA Standard 9.21. Here, three aggravating circumstances are present.

First, the accused failed to do work on his cases and allowed them to be dismissed repeatedly. By so doing, he engaged in a pattern of misconduct. ABA Standard 9.22(c). Second, the accused committed multiple offenses in that there were several victims of his misconduct. ABA Standard 9.22(d). Third, the accused has been practicing law for 38 years and therefore has substantial experience in the practice of law. ABA Standard 9.22(i).

"[M]itigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." ABA Standard 9.31. Some mitigating factors are present.

First, the accused does not have a prior disciplinary record. ABA Standard 9.32(a). Second the accused did not exhibit a dishonest or selfish motive. ABA Standard 9.32(b). Third, the accused suffered from recurrent depression and experienced personal and emotional problems. ABA

Standard 9.32(c). Fourth, both Nicholson's and Entelman's testimony indicated that the accused has a reputation for doing very good work for other employers and clients. ABA Standard 9.32(g). Finally, the accused showed remorse at his hearing before the trial panel. ABA Standard 9.32(l).

## C. *Oregon Cases*

Our preliminary analysis under the ABA Standards supports imposing a reprimand or a suspension for the accused's misconduct. We now review this court's case law.

In *Gresham*, 318 Or at 169, this court, guided primarily by the ABA Standards, suspended a lawyer for 91 days when he violated DR 6-101(B) and DR 1-102(A)(4) by neglecting a probate matter and failing to follow through with assurances to the court that he would close the estate. In *In re Spencer*, 335 Or 71, 88, 58 P3d 228 (2002), this court suspended a lawyer for 60 days for, among other violations, violating DR 9-101(C)(4) when the lawyer had been only negligent in his handling of the client's property. In *Schaffner*, 323 Or at 481, this court explained that a 60-day suspension was the appropriate sanction when a lawyer violated DR 1-103(C) after repeatedly failing to respond in a timely manner to Bar inquiries. In *Glass*, 308 Or at 305, this court suspended a lawyer for 91 days after concluding that he had violated both DR 1-102(A)(3) and DR 1-103(C) as the result of making misrepresentations and failing to timely respond to Bar inquiries.

This court's case law, however, also indicates that a lengthy suspension is appropriate when a lawyer makes a misrepresentation to the Bar. In *In re Devers*, 328 Or 230, 239-40, 245, 974 P2d 191 (1999), this court disbarred a suspended lawyer who violated several disciplinary rules, including making a false statement in his reinstatement application. That case is distinguishable from this one, however, because the lawyer had made several misrepresentations and had practiced law while his license to practice was suspended. *Id.* at 239-40. In *In re Wyllie*, 327 Or 175, 180-81, 184, 957 P2d 1222 (1998), this court suspended a lawyer for two years when he was untruthful about reporting earned MCLE credits to the Bar. That case also is distinguishable

from this one, because the lawyer had made several misrepresentations. He not only lied about the MCLE credits when he initially reported them to the Bar, but he also continued to lie about the credits during the Bar's investigation and at the trial panel hearing. *Id.* at 180-81.

## D. *Appropriate Sanction*

 Based on the foregoing review of the ABA Standards and this court's case law, we conclude that a suspension is the appropriate sanction for the accused's violations of DR 2-110(B)(2), DR 6-101(B), DR 1-102(A)(4), DR 9-101(C)(4), DR 1-102(A)(3), and DR 1-103(C). We must now determine the length of the suspension. In doing so, we are guided both by the aggravating and mitigating circumstances as well as by the foregoing cases.

We find significant the accused's extensive experience practicing law, his pattern of misconduct, and the number of violations that he committed. The accused has been practicing law for 38 years and has enough experience to understand how to avoid dilatory conduct and how his failures to act potentially could have impacted his clients' interests. We also conclude, however, that the accused's lack of a prior disciplinary record and his good reputation weigh in his favor. The testimony of Nicholson and Entelman suggests that the accused generally represents his clients in a highly professional and competent manner. While inexcusable, we think that the accused's neglectful handling of the various client matters in this case resulted primarily from inexperience and an overwhelming caseload.

The accused has emphasized the impact that his mother's illness and subsequent death had on his ability to do his work. The illness and death of a parent can be one of life's most traumatic events. However, in this case, we do not think that the accused's mother's illness played a significant causal role in the accused's misconduct. The accused already had been neglecting his cases before his mother became ill and the record does not reveal a significant nexus between the illness and the accused's continuing neglectful conduct. Thus, we do not assign substantial weight to that mitigating factor.

This court's cases support imposing a 90-day suspension as the appropriate sanction. In light of the weight that we give both the existing aggravating and mitigating factors, we conclude that a 90-day suspension is appropriate in this case.

The accused is suspended from the practice of law for 90 days, effective 60 days from the date of the filing of this decision.