Argued and submitted May 6; respondent is suspended from the practice of law for 60 days, commencing 60 days from the date of filing of this decision December 12, 2019

# In re Complaint as to the Conduct of
## ERIC J. NISLEY,
OSB No. 951049,
*Respondent.*

### (OSB 16-167) (SC S066100)

453 P3d 529

The Oregon State Bar alleged that respondent, a District Attorney, knowingly made six false and material statements to the Bar during an investigation into possible misconduct that had involved the investigation of certain payments made by another county official using county funds. A trial panel of the Disciplinary Board determined that respondent had made one such false statement, in violation of BR 8.1(a)(1), and suspended him for 30 days. *Held*: (1) The Bar proved by clear and convincing evidence that respondent had knowingly made four false, material statements, amounting to a single violation of BR 8.1 (a)(1); and (2) the appropriate sanction is a 60-day suspension.

Respondent is suspended from the practice of law for 60 days, commencing 60 days from the date of filing of this decision.

En Banc

On review of the decision of a trial panel of the Disciplinary Board.*

Lawrence Matasar, Lawrence Matasar, PC, Portland, argued the cause and filed the briefs for respondent.

Susan R. Cournoyer, Assistant Disciplinary Counsel, Tigard, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

Respondent is suspended from the practice of law for 60 days, commencing 60 days from the date of filing of this decision.

_____
  * Trial Panel Opinion dated June 11, 2018.

**PER CURIAM**

In this lawyer disciplinary proceeding, the Oregon State Bar alleged that respondent knowingly made six false and material statements to the Bar during an investigation into possible misconduct, in violation of Rule of Professional Conduct (RPC) 8.1(a)(1). A trial panel determined that respondent had made one such false statement, and it imposed a one-month suspension. Respondent requested review and seeks dismissal; the Bar counters that it proved all its allegations and requests a six-month suspension. On *de novo* review, we conclude that respondent made four false statements, and we suspend him from the practice of law for 60 days.

## I.    FACTS AND PROCEDURAL BACKGROUND

Respondent is the District Attorney (DA) for Wasco County, having served since 1999. In 2014, he initiated an investigation involving potentially unlawful conduct by one or more county officials, including the county's then-finance manager, Morris. Respondent later was accused by the county's counsel of violating a conflict-of-interest rule in connection with that investigation. In responding to an ensuing Bar inquiry, respondent made six statements that the Bar later alleged had been false. Although the Bar's false statement allegations—not the earlier-reported conflict-of-interest accusation—are at issue here, a description of the underlying events that led to the statements is necessary to put them in context. We take the facts set out below from the record.

A.    *Underlying Events*

The first underlying event occurred in 2011 and had involved inappropriate conduct by respondent toward Morris. At that time, respondent was serving as both Wasco County Counsel and DA. While he and Morris were attending a conference, they had gathered with others in the evening in a hotel lounge. Respondent—who was very intoxicated—directly propositioned Morris, and she refused. Respondent passed out shortly thereafter. He was embarrassed about the incident and apologized to Morris not long afterwards, and she accepted his apology. Morris told her supervisor, Stone,

who was the county's Administrative Officer, about the incident, but she declined the opportunity to pursue any action. The record otherwise does not reflect any further activity in connection with that incident, although Morris stated in an affidavit that, since then, respondent had engaged in other nonsexual, "but intimidating," behavior toward her, without elaboration. Respondent and Morris both continued to work for the county, in the same building.

The second underlying event involved an investigation that respondent initiated three years later, in his capacity as DA, again involving Morris.[1] In 2014, a local official asked respondent to check into a disbursement of county funds that Morris had made—specifically, two cash payments totaling $360 made to an intern, Davila, which Morris had treated as permissible advance salary draws. Unbeknownst to the inquiring official, or to respondent until much later, the payments apparently had been expressly authorized at the time by Stone. And, as will be seen, a key aspect of the parties' dispute involves the extent to which respondent focused on Morris during the investigation.

When initially told about the cash payments, respondent commented to the inquiring official that Morris would not have made them without Stone's authorization. He nonetheless thought that the payments were problematic, and, because the conduct involved another county official, he asked the Oregon State Police (OSP) to investigate. In doing so, he stated that an apparent unlawful loan of county funds—possibly amounting to official misconduct— had been made by Morris to Davila, with no mention of Stone. Shortly thereafter, in an effort to preserve evidence, respondent secured a subpoena *duces tecum* that granted him access to a large number of emails between Stone and others, including Morris and Davila.

OSP referred respondent to the Oregon Department of Justice (DOJ), and respondent then submitted a similar investigation request to DOJ. DOJ's memorializing intake form and case note stated that respondent had requested

---

[1] Respondent also continued as the Wasco County Counsel until late 2014.

"the investigation \*\*\* of \*\*\* Morris";[2] mentioned no other county official; and noted a possible statutory violation. DOJ opened a case in December and assigned an investigator, Culley, and an Assistant Attorney General, Benson. Based generally on the nature of respondent's initial request, DOJ's intake form identified Morris as the "subject."

Culley began contacting witnesses, and Stone sent him documentation, spoke with him by phone, and was interviewed by him and Benson. Stone's documentation showed that Morris recently had explained the cash payments to him as permissible salary draws under the county employees' union bargaining agreement. Stone also told Culley that cash advances were a local practice and that he was not concerned about the allegations. And, Stone told Culley and Benson about the 2011 incident between respondent and Morris, and he commented that respondent's current actions were "axe grinding" against her. Culley and Benson also interviewed Morris, who similarly relied on the bargaining agreement to support the payments. By the end of their witness interviews, Culley and Benson tentatively concluded that the bargaining agreement had permitted the payments and that no improper conduct had occurred. DOJ did not generate a report for a few months, however.

In the meantime, respondent had become increasingly frustrated at the progress and quality of the DOJ investigation, and, beginning in January 2015, he began contacting DOJ with some frequency. In many of those communications, he asked about the status of the "Morris" case—which, as noted, is what DOJ had named its case file based on his initial inquiry. In one email, he wrote that Morris was "in charge of all the County's finances and appears to have committed a crime"; in others, he wrote that this was a "very serious matter[, involving] not simply an employee draw [but] an illegal loan of taxpayer's funds," and that he was "very concerned" about Morris's conduct and the fact that she continued to work as finance manager with limited oversight. In one of those emails, he also wrote that Morris

---

[2] The intake form and case note also said that respondent had requested the "prosecution" of Morris, but he denies having requested any "prosecution," and no clear and convincing evidence counters that denial.

appeared to be concealing information from elected officials; in another, he forwarded information about an earlier cash payment that she apparently had made to a different employee; in yet another, he noted a finding of "discrepancies in the county's cash fund." He also suggested additional persons to interview and stated that, if DOJ declined to investigate, he would do so. After one phone call with respondent, Benson noted that he "wants us to prosecute" Morris. From DOJ's perspective, respondent was exclusively focused on Morris as a wrongdoer.

In February, Benson told respondent that DOJ had determined that it did not appear that DOJ would be able to press criminal charges, citing the bargaining agreement and DOJ's interview information. Respondent disagreed, and he also thought the agreement had not covered an intern, such as Davila. He therefore wrote to Benson's supervisor, Tuttle, in early March, stating that he would complete the investigation locally and requesting that DOJ send its documentation to him.

Later in March, Culley issued a report that concluded that nothing supported the allegation that Morris had committed a crime by disbursing funds under the bargaining agreement.[3] That report identified Morris as a "subject" and Stone as a "witness." Also, Benson wrote a declination of prosecution letter to respondent, explaining that the cash payments had been "legal" under the bargaining agreement and generally mentioning Stone's apparent approval. At this juncture—given the nature of all respondent's communications with DOJ—Culley, Benson, and Tuttle all understood respondent's sole focus in the investigation to have been on Morris, not on Stone or anyone else, and they also thought that respondent wanted them to prosecute Morris.

DOJ then turned its materials over to respondent. When respondent reviewed Culley's report, he concluded that Culley had been biased toward Morris, and he sent Benson an email to that effect. He also decided to interview Davila, which DOJ had not done. That ensuing interview uncovered

---

[3] The report further stated that "[a]ny suggestion that funding the payroll draws in cash is a crime was not supported by this investigation."

information that was both new and significant to respondent: Davila told him that Stone expressly had approved the cash payments contemporaneously with Morris making them. Respondent thought that that information actually exonerated Morris because she had acted with Stone's permission; he also thought that it implicated Stone.

Meanwhile, Morris had found it difficult to work in the same building as respondent. She discussed her discomfort with lawyers representing the county, who in turn learned about the earlier 2011 incident between Morris and respondent. Concerned that Morris might take action against the county, the Wasco County Counsel, Timmons, asked DOJ for its investigatory materials. Tuttle asked respondent for permission to release them, but he initially declined, citing his ongoing investigation. That communication appears to have occurred before he interviewed Davila.

In May, Timmons sent a second materials request to DOJ, and Tuttle again asked respondent whether Morris was still under investigation. Respondent answered that he had not yet completed his work, but also that "Morris is actually not the suspect in this matter." He elaborated that, following his interview with Davila, Morris had been absolved of wrongdoing. Tuttle responded that she was surprised to hear him deny that Morris was the "suspect" because, in his communications with DOJ, he had focused solely on Morris.

Respondent decided to seek outside review as to whether he should pursue criminal charges arising from the cash payments. In June, he prepared summary materials— which focused on Stone's role in authorizing the payments and his own assessment that the bargaining agreement had not applied—and sent them to another DA for review. That DA agreed with respondent that the payments had not been proper and that the bargaining agreement had not covered Davila. He further recommended, however, against prosecuting Morris or Stone. Respondent thereafter closed his file.

B.   *Bar's Investigation and Alleged False Statements*

Meanwhile, in May 2015, Timmons had complained to the Bar's Client Assistance Office (CAO). Among other, unrelated allegations, he asserted that respondent had

initiated a "retaliatory" investigation against Morris, which had involved a "personal interest" conflict of interest under RPC 1.7(a)(2), in light of the 2011 incident.[4] The CAO assessed that Timmons's allegations might have implicated RPC 1.7(a)(2) and also RPC 3.1 (prohibiting frivolous proceedings or actions), and it asked respondent to respond, focusing on those rules and his "alleged retaliatory investigation."

Over the next 10 months, the CAO and, later, the Bar's Disciplinary Counsel Office (DCO), engaged in further written communications with respondent. Respondent wrote four letters to the Bar, two through counsel (both to the CAO), and two while representing himself (both to the DCO). The Bar alleges that, in his first three letters written over a four-month period, respondent knowingly made six false statements that were material to the Bar's investigation. We provide greater detail about those six statements later in this opinion; they can be summarized as follows: (1) Morris had not been the "target" of any investigation, and respondent never had seen her as the "target" (three statements); (2) Morris never had been the "subject" of the investigation (one statement); and (3) respondent had requested a "general investigation" about the cash payments, and his concern had been completing that investigation to determine who had authorized them (two statements).

C.  *Complaint and Trial Panel Proceeding*

The Bar filed a formal complaint that briefly described the 2011 incident; respondent's investigation of the cash payments, including the nature of his representations to others (particularly DOJ staff) about Morris; and the nature of Timmons's complaint accusing respondent of initiating and pursuing a retaliatory investigation against Morris that had posed a conflict of interest. The Bar alleged that, in response to its inquiries, respondent had denied that he had had any personal-interest conflict related to the investigation "because, he claimed, he had not targeted

---

[4] Timmons specifically wrote that, since the 2011 incident, Morris perceived that respondent had engaged in intimidating behavior toward her, in retaliation for her rebuffing his proposition and reporting the incident to her supervisor. As discussed later, the trial panel determined that the Bar had not proved that any "retaliatory" investigation had occurred.

Morris in his investigation" and, in support of that theory, had made the six alleged false statements. The Bar further alleged that each statement had been both false and material to its inquiry, and had been knowingly made, in violation of RPC 8.1(a)(1).[5]

The matter proceeded to a hearing before a trial panel of the Disciplinary Board. Respondent was represented by counsel;[6] neither Morris nor Stone testified.

In assessing the evidence, the trial panel evaluated respondent's alleged false statements in the three categories identified above: his denials that Morris had been a "target"; his denial that she had been a "subject"; and his assertions about the nature of his investigation. The panel also framed the inquiry in the context of Timmons's initial complaint to the Bar—that is, Timmons had accused respondent of initiating a "retaliatory" investigation against Morris, and respondent thus had responded within that framing, denying that he had acted with any retaliatory motive.

The trial panel addressed the retaliation issue first and found that respondent had not retaliated against Morris; instead, his investigation had been legitimate and nonretaliatory. Turning to the three "target" statements, the panel determined that those statements should be understood to mean that respondent had not "targeted" Morris—that is, he had not viewed her as a "target in retaliation" when he initiated and pursued the investigation. It followed, in the panel's view, that the Bar did not prove that those three statements had been false when made.

The trial panel also determined that the Bar had not proved that respondent's statements about the nature of the investigation had been false. In support, the panel cited respondent's legitimate interest, as the county's DA, in investigating a seemingly improper loan involving county funds and evidence in the record showing how his approach to the investigation had been consistent with his statements.

---

[5] The Bar did not allege any violation of the rules pertaining to conflicts of interest or frivolous proceedings.

[6] Respondent's lawyer at the hearing was not the same lawyer who had submitted his first two response letters.

The trial panel did determine, however, that respondent knowingly had made a false, material statement when he told the Bar that Morris never had been the "subject" of the investigation. In the panel's view, because the investigation had focused on Morris, she necessarily had been its "subject." For that violation of RPC 8.1(a)(1), the panel imposed a one-month suspension. As noted, both parties seek *de novo* review. *See* BR 10.6 (setting that standard).

## II.   ANALYSIS OF MISCONDUCT ALLEGATIONS

### A.   *RPC 8.1(a)(1) and Parties' Arguments*

RPC 8.1(a)(1) provides that a lawyer, "in connection with a disciplinary matter," shall not "knowingly make a false statement of material fact." The Bar must prove its allegations by clear and convincing evidence, BR 5.2, meaning that the truth of facts asserted is "highly probable," *In re Cohen*, 316 Or 657, 659, 853 P2d 286 (1993).

The parties' key dispute involves what respondent meant when he denied that Morris had been a "target" or "subject" of the investigation, and otherwise stated that he had intended to initiate and complete a general investigation into the propriety of, and responsibility for, the cash payments. Respondent contends that the Bar has failed to provide consistent and satisfactory definitions of "target" and "subject," and that it has used those terms—as well as "potential target," "potential subject," "suspect," and "potential suspect"—interchangeably throughout the proceedings. It follows, he argues, that the Bar has failed to prove that his statements were unambiguous or, more importantly, false. The Bar, by contrast, is not as concerned with specific definitions of the identified words; instead, it argues that respondent's focus all along had been Morris and that his statements all sought to create a materially false narrative in responding to the Bar's inquiries about possible misconduct involving a conflict of interest.

### B.   *Analytical Framework*

We begin by clarifying the nature of our inquiry under RPC 8.1(a)(1). That rule was adopted in 2005 as part of the then-new Oregon Rules of Professional Conduct. The

former Oregon Code of Professional Responsibility had no companion rule for false statements made in connection with a disciplinary matter; instead, such statements were addressed under the general "misrepresentation" rule or other similar rules. *See former* DR 1-102(A)(3), now RPC 8.4(a)(3) (professional misconduct to engage in conduct involving misrepresentation that reflects adversely on the lawyer's fitness to practice law); Oregon Rules of Professional Conduct, Rule 8.1, Comparison to Oregon Code at 32 (2019) (new RPC 8.1(a)(1) replaced *former* DR 1-101, which prohibited false statements during the admission process, "but is broader" because the new rule also applies to any "disciplinary matter");[7] *see also, e.g.*, *In re Worth*, 336 Or 256, 271-73, 82 P3d 605 (2003) (evaluating false statement to Bar during investigation under *former* DR 1-102(A)(3)); *In re Huffman*, 331 Or 209, 13 P3d 994 (2000) (evaluating false statements to Bar's investigator under *former* DR 1-103(C) (lawyer must respond "fully and truthfully" to Bar's inquiries)).

This court has not yet specifically analyzed a misconduct allegation under RPC 8.1(a)(1).[8] However, the parties appear to agree—as do we—that we should apply the same analysis that we would apply to a false statement allegation under the "misrepresentation" rule, RPC 8.4(a)(3).[9] *See generally In re Merkel*, 341 Or 142, 151-52, 138 P3d 847 (2006) (alleged false statement to Bar during investigation analyzed under *former* DR 1-102(A)(3), along with alleged misrepresentation made to opposing counsel). When evaluating an affirmative misrepresentation allegation, this court must answer the following questions: (1) whether the statement at issue was false when it was made; (2) if so, whether the lawyer knew that it was false at that time; (3) if so, whether

---

[7] *See* https://www.osbar.org/_docs/rulesregs/orpc.pdf (accessed Dec 5, 2019).

[8] We have summarily decided two cases in which the Bar alleged violations of RPC 8.1(a)(1) (among other rules), but neither case required any specific analysis. *See In re Kirchoff*, 361 Or 712, 721, 399 P3d 453 (2017) (court summarily agreed with trial panel that all allegations had been proved); *In re Roller*, 361 Or 234, 390 P3d 1045 (2017) (lawyer did not file opening brief on review).

[9] RPC 8.4(a)(3) provides that "[i]t is professional misconduct for a lawyer to *** engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law[.]" We note that the final element of that rule—that the conduct reflects adversely on fitness to practice—does not apply to a violation alleged under RPC 8.1(a)(1).

the statement was material and whether the lawyer knew that, as well. *See In re Fitzhenry*, 343 Or 86, 104, 162 P3d 260 (2007) (applying that analysis under *former* DR 1-102 (A)(3)); *In re Brandt/Griffin*, 331 Or 113, 139-41, 10 P3d 906 (2000) (same, in case applying *former* DR 1-102(A)(3) to false statement made during Bar investigation); *In re Gustafson*, 327 Or 636, 648-49, 968 P2d 367 (1998) (explaining knowledge and materiality inquiries). A statement is material if it would or could have influenced the decision-making process significantly—specifically in the context of RPC 8.1 (a)(1), whether it would or could have influenced the Bar in its decision-making about a disciplinary matter. *See generally In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001) (stating general standard); *see also Worth*, 336 Or at 273 (misrepresentation to Bar could have affected evaluation of misconduct allegations); *Brandt/Griffin*, 331 Or at 141 (misstatements were material to Bar's inquiry because they affected the assessment whether to formally investigate).

This case primarily concerns the first question set out above: whether the six statements that respondent made to the Bar were false when he made them. It also presents a question about the potentially ambiguous nature of words that respondent used, specifically, "target" and "subject." As discussed next, our case law provides a framework for analyzing allegedly false, but ambiguous statements.

The key case is *Merkel*, 341 Or 142. There, a lawyer had written to opposing counsel that an arbitrator had "cleared" having certain witnesses testify by telephone. In fact, the arbitrator had told the lawyer that telephone testimony was permissible, so long as opposing counsel did not object. *Id.* at 145. The Bar alleged a violation under the misrepresentation rule, *former* DR 1-102(A)(3), arguing that the lawyer had knowingly created the false impression that "the issue was a 'fait accompli.'" *Id.* at 149. This court explained that the word "cleared," as the lawyer had used it, was ambiguous because it could have been understood in more than one way: either the arbitrator had authorized the telephone testimony (as the Bar had argued), or the arbitrator had been amenable to telephone testimony, but had not expressly authorized it (as the lawyer had argued). The court then explained that the lawyer's statement must be

viewed in the context in which it had been made and that, in examining the evidence, the court may consider the relative strength of the competing inferences that the ambiguous word ("cleared") could have created. *Id*.; *see also In re Phelps*, 306 Or 508, 513, 760 P2d 1331 (1988) (Bar may satisfy its burden in proving misconduct if the court draws necessary supporting inferences from the evidence). Further, in determining which of two competing inferences the lawyer likely had intended to convey, the court may examine all the circumstances surrounding the statement. *Merkel*, 341 Or at 150. Ultimately, a majority of the court concluded that the record did not support the inference on which the Bar had relied—that the lawyer knowingly had conveyed to opposing counsel that the arbitrator had authorized the telephone testimony. *Id.* at 150-51.[10]

Applying that framework here, we first identify the competing inferences that could be drawn from respondent's alleged false statements, namely his statements denying that Morris had been a "target" or a "subject" of the investigation. Respondent asserts that he used those words in a narrow way—primarily, with "target" meaning that he had not been *retaliating* against Morris (*i.e.*, he had not "targeted" her), and "subject" meaning a person likely to have committed criminal conduct *after* the assessment of facts gathered during an investigation (*i.e.*, not a person merely involved in the underlying facts of a potential crime). It follows, he continues, that his statements were true, because the record shows that (1) he had not initiated any retaliatory investigation against Morris; and; (2) once all the investigatory facts had been gathered and assessed, it had become clear that she had engaged in no wrongdoing. Respondent also argues that, although Morris's *conduct* was a subject of investigation, she *herself* was not its focus, and so all his

---

[10] Respondent reads *Merkel* for the proposition that the Bar *cannot* establish misconduct based on ambiguous statements; the Bar similarly cites *Merkel* as holding that misrepresentation *cannot* be established when an ambiguous statement is subject to two equally credible interpretations. Those characterizations are not quite on the mark. More precisely, under *Merkel*, we must evaluate an ambiguous statement by identifying the competing inferred meanings and then determining whether the Bar has proved by clear and convincing evidence that the lawyer intended the Bar's proffered meaning, based on the surrounding context and other evidence in the record. 341 Or at 149-51.

statements—including those about the general nature of the investigation—were true.

The Bar disagrees that respondent's statements had sought to counter the notion of any "retaliatory" investigation or otherwise utilize narrow definitions of "target" or "subject." Instead, the Bar asserts, respondent intended more colloquial, and interchangeable, meanings of those words, intending to convey (falsely) that Morris had not been the focus of the investigation at all. His underlying goal, the Bar continues, was to deflect the Bar's attention away from his focus on Morris, which in turn would have undercut any theory that he might have had a personal-interest conflict.

To determine the intended meaning of respondent's statements, we must assess the strengths of the competing inferences just summarized, by examining each statement, the context in which each statement was made, and other relevant evidence in the record. *Merkel*, 341 Or at 149-51; *see also In re Lawrence*, 337 Or 450, 469, 98 P3d 366 (2004) (rejecting lawyer's proposed meaning of her statement as implausible, based on evidence in the record). We then must determine whether the Bar proved—by clear and convincing evidence—whether each statement was knowingly false and material when respondent made it. As explained below, we conclude that the Bar proved its allegations as to four of the statements.

## C. *Evaluation of Alleged False Statements*

### 1. *Initial accusation and inquiry, and respondent's first letter*

We begin by reiterating the nature of Timmons's initial complaint to the Bar. He recounted details of the 2011 incident and alleged that, since then, respondent had engaged in what Morris had characterized as "intimidating behavior toward her in retaliation for her refusal [of his proposition of her] and her reporting of the incident to [her supervisor, Stone]."[11] He then wrote that, in Morris's view, the investigation of the cash payments had been "retaliatory." Finally,

---

[11] As noted, Morris did not testify at the hearing, and the record does not clearly and convincingly show that respondent had engaged in any specific "intimidating behavior" toward her, in the manner described in Timmons's letter.

he surmised that the described conduct had amounted to a personal-interest conflict under RPC 1.7(a)(2), defined as the existence of a "significant risk" that the representation of a client (here, the county) would be "materially limited by \*\*\* a personal interest of the lawyer[.]"

In its own initial letter to respondent, the CAO asked him to address the "alleged retaliatory investigation" against Morris as well as RPC 1.7(a)(2) and also RPC 3.1 (prohibiting frivolous proceedings or actions). That is, the CAO's first communication with respondent framed the key inquiry as whether respondent had engaged in a "retaliatory investigation" that had violated conflict-of-interest or meritless-claim rules.

Consistently with that framing, respondent's first letter included a section entitled, "[Respondent] Did Not Open a Retaliatory Investigation Against Ms. Morris." There, he wrote that he had opened an investigation into the potential misuse of public funds and learned through that investigation that Stone had approved the cash payments. He then described the DOJ referral and recounted that DOJ had interviewed Stone, concluded that the bargaining agreement had permitted the payments, and closed its investigation. He next explained his continued investigation, including confirming that the bargaining agreement had not covered Davila. He wrote that "[t]he focus of the investigation was the misuse of public funds generally and [ ] Stone in particular[,]" and that he never had sought an interview of Morris. In concluding that section's factual summary, he made the first alleged false statement:

> "[Respondent] never saw Ms. Morris as a target of the investigation and, in fact, believes Ms. Morris is not responsible for any impropriety regarding the [cash payments] because Mr. Stone (and not Ms. Morris) authorized them."

In a later section analyzing the conflict-of-interest rule, respondent reiterated that Timmons had accused him of "retaliation"; he then made the second alleged false statement:

> "The simple answer to Mr. Timmons'[s] contention is that Ms. Morris was never the subject of [respondent's] investigation."

He followed that sentence with specific examples about the investigation's "scope," purporting to showing how Morris had not been the subject—including the earlier subpoena *duces tecum* that had focused on Stone and the fact that he never had interviewed Morris.

We understand much of respondent's first letter to argue that the investigation, *in fact*, had not been retaliatory—which was understandable, given that Timmons had asserted as much and the CAO had framed its initial inquiry in that manner. Respondent's proffered meaning of his first statement—that he never had seen Morris as a "target" *in retaliation*—logically fits within that framing. As noted, his first statement appeared at the end of the factual summary of a section of his letter entitled, "[Respondent] Did Not Open a Retaliatory Investigation Against Ms. Morris[,]" *i.e.*, asserting that he *in fact* had not initiated and pursued a retaliatory investigation. In that context, respondent plausibly used the word "target" to mean that he had neither "targeted" nor sought to retaliate against Morris. We acknowledge, as the Bar points out, that other aspects of respondent's first letter arguably support the Bar's argument that "target" actually meant "focus."[12] But we do not think that that contrary inference—when viewed in the context of the first statement—is supported by clear and convincing evidence.[13]

---

[12] The Bar emphasizes that respondent made his first statement as part of recounting the investigation in a manner that deflected any focus on Morris. By contrast, in a different part of his letter, he specifically countered Timmons's "retaliation" accusation, pointing out factors tending to show why the 2011 incident had not been retaliatory.

[13] The trial panel similarly concluded that "target" should be understood to mean "target in retaliation"—that is, to deny that respondent in fact had retaliated against Morris. It went on to determine that none of respondent's "target" statements had been false because respondent, in fact, had not initiated and pursued a retaliatory investigation against Morris. We need not take that second analytical step, in light of the Bar's arguments on review. Specifically, the Bar focuses on its proffered meaning of respondent's first statement (which we have rejected) and otherwise emphasizes that it need not prove whether respondent initiated a retaliatory investigation because it never charged him with misconduct of that nature.

We also depart from the trial panel's approach of treating all three of respondent's "target" statements collectively (and all meaning "target in retaliation"). Although we have determined that the Bar failed to prove that respondent's first "target" statement did *not* mean "target in retaliation," we assess his subsequent "target" statements differently.

We reach a different conclusion as to respondent's second statement—that the "simple answer" to Timmons's "retaliation" contention was that Morris "was never the subject" of respondent's investigation. Notably, respondent offered that statement to make a different point from his first statement: rather than trying to show that the investigation *in fact* had not been retaliatory against Morris, his second statement was offered to show the investigation *could not have been* retaliatory because Morris never had been its subject. As noted earlier, he proffers the inference that he had used "subject" in the narrow sense—meaning a person whom an investigation reveals has likely committed a crime. As to Morris, he asserts that her *conduct* in making the cash payments had been the focus of the investigation, but she herself never had become its "subject" because the investigation ultimately exonerated her, and his denial in that regard therefore had been true. The Bar counters with a different inference: In denying that Morris ever had been the "subject," respondent meant to convey that his investigation never had focused on Morris at all (such that no conflict of interest could have existed).

The context surrounding respondent's second statement supports the Bar's proffered inference, not respondent's. As noted, immediately after making that statement, respondent pointed to the "scope" of his investigation, describing a subpoena focused on Stone and no interview of Morris. That supporting explanation shows that, rather than seeking to clarify that he simply had not uncovered sufficient evidence to establish that Morris likely had committed a crime, respondent was trying to deflect the Bar's attention away from his focus on Morris as the potential wrongdoer. Relatedly, earlier, his letter had created the false impression that he had learned shortly after initiating the investigation that Stone had approved the cash payments—thereby suggesting that Stone, not Morris, had been identified as responsible from early on. In fact, he did not learn about Stone's express, contemporaneous approval until after the DOJ investigation had ended. In sum, the context surrounding respondent's second statement supports the inference that, in denying that Morris had been the "subject" of the investigation, he had intended to convey that she had not been its focus (and,

therefore, that the investigation could not have been retaliatory, thus implicating the conflict-of-interest rule).

The record also shows that respondent's second statement was false, and knowingly so, when made: During the investigation—and certainly throughout DOJ's involvement—respondent had presented Morris, and no one else, as the focus and potential wrongdoer. As described, he initially mentioned only Morris (specifically, her conduct) to DOJ, even though he earlier had commented that she would not have made the cash payments without Stone's approval. Then, in multiple communications with DOJ, he inquired about the status of the case in a way that focused on Morris and, more importantly, suggested a sense of urgency about her personally: that she may have engaged in financial malfeasance; that she was still handling county funds; that she had made a similar cash payment in the past; and that she appeared to be concealing information from officials. That is, in addition to Morris's conduct being a focus of the investigation, Morris herself was the exclusive focus of respondent's communications with DOJ, respecting both its investigation and potential identification of a wrongdoer. Respondent's sole focus on Morris continued right up to the point when he learned from Davila that Stone expressly and contemporaneously had authorized the payments.

We additionally conclude that respondent's second statement was material to the Bar's inquiry: If he had been forthcoming about his continuing focus on Morris, that would have affected the Bar's assessment whether the investigation had been retaliatory and, relatedly, whether he had a conflict of interest. And, we agree with the Bar that respondent knew that the issue was significant to the Bar's inquiry. *See generally Lawrence*, 337 Or at 470 (from surrounding facts, lawyer had to have known that her misrepresentation by omission had been essential to Bar's assessment whether she had engaged in misconduct); *Worth*, 336 Or at 273 (to similar effect).[14]

---

[14] That is not to say that, had respondent been forthright about his continued focus on Morris, the Bar necessarily would have determined that the investigation *had* been retaliatory. However, accurate information would have allowed the Bar to assess more readily the nature of respondent's focus on Morris and, given that, whether it bore any connection to the 2011 incident, as Timmons had alleged.

2.   *Respondent's second letter*

After the CAO received respondent's first letter, it also received additional communications from Timmons, again suggesting that Morris had been a "subject" of the investigation and that a conflict of interest had existed. The CAO asked respondent to address those concerns, and he sent a second letter, through counsel. At the beginning of a section under the heading, "Ms. Morris was not the 'subject' of a criminal investigation," respondent made the third statement that the Bar alleges was false:

"As we explained in our [first letter], [respondent] did not consider Ms. Morris the target of any investigation."

We observe initially that the context for respondent's second letter was different from his first: While much of his first letter had attempted to counter Timmons's accusation that his investigation of Morris *in fact* had been retaliatory, his second letter responded to the Bar's specific question whether Morris had been "a subject" of his investigation—because, if so, his investigation *could* have been retaliatory and thus could have implicated the conflict-of-interest rule. In responding to that specific question, after stating initially that he had not considered Morris a "target," respondent made factual assertions to the following effect: (1) Morris's conduct—specifically, the propriety of the cash payments—but not Morris herself, had been the subject of his investigation; (2) respondent had thought from the outset that she would not have made the payments without Stone's approval and never suspected her of wrongdoing; (3) Stone's acknowledgment of the payments to DOJ showed that Morris had not engaged in unlawful activity; and (4) respondent's focus following the DOJ investigation had been on the applicability of the bargaining agreement, the propriety of the payments generally, and Stone's approval of them. Respondent then denied having taken any steps "to focus the investigation on [] Morris" and wrote that, although the investigation prudently had assessed her involvement, "that [did] not mean she was a target—let alone a target for allegedly retaliatory purposes based on something that had happened years before."

When respondent's second letter is read in its entirety, it is apparent that he intended to convey to the Bar in his third statement that Morris herself had not been the focus of the investigation. Most notably, he again asserted an early belief that Morris would not have acted without Stone's approval, and he again presented a timeline suggesting that he had concluded relatively early on that Morris had not acted unlawfully, when, in fact, he did not draw that conclusion until after DOJ had closed its investigation. We also think his concluding statement to be significant—that the fact that the investigation had assessed Morris's involvement "[did] not mean she was a target—let alone a target for allegedly retaliatory purposes ***." That statement shows that respondent himself understood that the word "target" could carry two different meanings—both a focus of the investigation and a target in retaliation. That context supports the Bar's proffered inference of what respondent meant in his alleged third false statement: He intended to convey that Morris had not been the focus of his investigation, rather than simply conveying that she had not been a target in retaliation. As explained earlier, the record established that that statement had been false, and, also for reasons discussed earlier, the record further establishes that it had been material to the Bar's inquiry and knowingly made.

3. *Respondent's third letter*

After receiving respondent's second letter, the CAO referred the matter to the DCO, which sought additional information from DOJ. Tuttle provided documentation of six communications between DOJ and respondent, the thrust of which was that—contrary to some of the narrative in his earlier letters—respondent in fact had continually highlighted Morris, and no one else, to DOJ as the focus of the investigation and likely wrongdoer. The CAO sent that documentation to respondent's counsel and requested a response, including as to the discrepancy between respondent's earlier statement that he never had seen Morris as a target and documents showing that he had wanted DOJ to investigate Morris. At some point, respondent became unrepresented, and so he sent the third letter in his own behalf.

At the outset of his third letter, under the heading, "I did not view Ms. Morris as the target of the investigation," respondent wrote that he had not "target[ed]" Morris and reiterated his initial thought that she would not have made the cash payments without Stone's approval. He then made the fourth alleged false statement:

> "[In asking OSP and DOJ to investigate,] [m]y plan was to ask for a general investigation surrounding two seemingly improper loans of public funds."

He added that he had mentioned Morris in his referrals because she had been the person who had made the payments, and he explained that he referred in emails with DOJ to the "Morris case" because that is what DOJ had named the investigation.

Later in his third letter, under the heading, "Verbiage in eMails *** Does Not Establish Retaliatory Investigation," respondent explained that his communications with DOJ had been motivated by his frustration with the investigation, namely, DOJ's lack of action and its reading of the bargaining agreement. Citing emails in which he had said that Morris "appears to have committed a crime" and that he was concerned about her conduct as finance manager, he made the fifth alleged false statement (emphasized wording):

> "In hindsight, I can understand how someone would infer that I saw her as a suspect, but I know what was in my mind at the time[,] and it was *concern about completing this investigation and determining who was responsible for authorizing the improper loans.*"

(Emphasis added.)

Finally, near the end of his third letter, respondent made his sixth and final alleged false statement:

> "Ms. Morris was in the stream of an investigation, and was not the target."

He concluded by stating that, although the investigation had involved Morris, "[t]his does not equate to me thinking [that she] was the 'target' of the investigation—I did not have enough information to form an opinion as to who might be the 'target.'"

We begin with the two "nature of the investigation" statements (fourth and fifth statements). Unlike the three statements already addressed, respondent's fourth and fifth statements do not require that we assess competing inferences; rather, the question is simply whether the Bar proved that those statements were false when made.

As to respondent's fourth statement—that, in asking OSP and DOJ to investigate, he had planned to ask for "a general investigation surrounding two seemingly improper loans of public funds"—the Bar's evidence falls short. It is true that respondent mentioned Morris (and no other official) in both referrals, and that he identified the payments as a potential "unlawful loan." As he argues, though, Morris was the person who made the payments, and he had limited information available at the time about the surrounding circumstances. No supporting evidence supports the notion that—at the time when he made the referrals—he sought to focus on Morris personally, to the exclusion of anyone else, as opposed to investigating her conduct in making the payments to determine whether the payments had been authorized or otherwise permissible.

We reach a contrary conclusion as to respondent's fifth statement—that, in the early 2015 timeframe when he repeatedly communicated with DOJ, his concern had been to complete the investigation and determine who was responsible. As recounted earlier, many of respondent's communications were focused exclusively on Morris, in a way that demonstrated that he sought to convey to DOJ that she alone had engaged in wrongdoing. And, respondent had told DOJ that Culley's report showed bias toward Morris, again showing respondent's focus on Morris as a wrongdoer. Although we do not disagree with respondent that he *also* may have been concerned with completing the investigation and finalizing any assessment about who was responsible, the Bar presented clear and convincing evidence that he had sought to focus DOJ's attention on Morris.[15] And, as

---

[15] We disagree with the trial panel's assessment that respondent's fifth statement could have been false only if respondent had a hidden retaliatory motive beyond the investigation—that is, that the investigation was actually not a "general investigation" but, instead, had been intended to retaliate against Morris.

described earlier, his statement was knowing and material to the Bar's inquiry.

Finally, respondent's sixth statement again used the word "target"—that Morris had been "in the stream of an investigation, [but] was not the target." The surrounding context shows that he did not intend, in that statement, to mean "target in retaliation." Rather, he immediately clarified what he meant, characterizing a "target" as a person about whom sufficient information has been gathered for a decision-maker to assess that the person is, or likely is, the wrongdoer in a given situation.

As to whether his "stream of an investigation, [but] not the target" statement was false, respondent contended that Morris had not been the "target" under his definition. On the one hand, it was not false to say that sufficient information had not pointed to Morris as a wrongdoer. On the other hand, though, by the end of the DOJ investigation, respondent had repeatedly sent DOJ communications that focused on Morris, and no one else, as a wrongdoer. Notably, earlier in his third letter, he wrote that—at the point in time when he had been frustrated with the DOJ investigation—he did "not recall focusing on [] Morris's conduct in a singular fashion[,]" and he did not believe that she would have acted without her supervisor's authorization. The difficulty for respondent, though, is that the facts at that juncture did not bear out either proposition: to the contrary, those aspects of his letter support the Bar's contention that, when respondent ultimately concluded his letter by stating that Morris had been "in the stream of an investigation, [but] was not the target[,]" he intended to falsely convey to the Bar that he had not singularly focused on Morris, when, in fact, he had. As with the other false statements, that statement was knowingly made and material to the Bar's inquiry.

D.  *Summary*

In sum, we conclude that the Bar proved that respondent violated BR 8.1(a)(1)—which it charged as a single violation—when he knowingly made four statements to the Bar, in three separate letters over a four-month period, that were false and material to the Bar's inquiry. We turn to the question of the appropriate sanction.

## III.   SANCTION

In determining the appropriate sanction, we refer to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards), for guidance.   *Lawrence*, 337 Or at 470. We first identify the duty violated, respondent's mental state, and the injury caused. *Id.* at 471. We next assess the appropriate preliminary sanction and determine whether aggravating or mitigating circumstances affect our preliminary assessment. *Id.* Finally, we evaluate applicable case law. *Id.* As noted earlier, the trial panel imposed a one-month suspension (for one false statement); the Bar argues for a six-month suspension (based on six false statements). We conclude, as explained below, that a 60-day suspension is appropriate.

As to the duty violated, when respondent made false statements to the Bar in connection with a disciplinary matter, he violated his duty as a professional to cooperate completely and truthfully within a disciplinary investigation. ABA Standard 7.2; *Lawrence*, 337 Or at 471.

As to mental state, we have concluded that, in making four false statements, respondent acted knowingly. *See* ABA Standards at 7 (act is knowing if engaged in with the "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result").

As to injury, we agree with the Bar that a lawyer can cause injury to the lawyer disciplinary system when the lawyer is not candid during the investigatory process. *See Lawrence*, 337 Or at 472 (lawyer caused injury to the profession when she failed to be truthful with the Bar). In this case, although the Bar ultimately obtained clarifying information from DOJ, it would not have had to do so had respondent been forthcoming in his responses—in that scenario, the Bar more readily could have assessed the validity of Timmons's accusation that respondent had initiated a retaliatory investigation that posed a conflict of interest.

The ABA Standards suggest that the appropriate preliminary sanction is a suspension. *See* ABA Standard

7.0 (suspension is appropriate when a lawyer "knowingly engages in conduct that is a violation of a duty owed to the profession").

Turning to aggravating and mitigating circumstances, we agree with the Bar that the following aggravating factors apply: selfish motive, in that respondent sought to avoid any potential negative effects of the Bar's investigation, ABA Standard 9.22(b); and substantial experience in the practice of law, ABA Standard 9.22(i). We also agree that respondent engaged in a pattern of misconduct, ABA Standard 9.22(c), in that he made multiple false statements over a period of time, although we note that his false statements were essentially repetitive of the same points.[16] The only mitigating factor is no prior record of discipline, ABA Standard 9.32(a).

Finally, we examine our case law. The Bar cites *In re Miles*, 324 Or 218, 222-23, 923 P2d 1219 (1996), and related cases, in which this court has emphasized the seriousness with which it views the failure of a lawyer to cooperate with a disciplinary investigation. In *Miles*, the court imposed a 120-day suspension on a lawyer who had failed to respond to the Bar's inquiries. *See also In re Parker*, 330 Or 541, 551, 9 P3d 107 (2000) (failure to cooperate, standing alone, is a serious ethical violation). While the concept of cooperation has some applicability here, both *Miles* and *Parker* concerned an utter failure to cooperate, as opposed to cooperation that involved false statements. The court's discussion in those cases thus does not squarely address the same type of misconduct that occurred here. *See Miles*, 324

---

[16] We decline to apply the following additional aggravating factors urged by the Bar: deceptive practices during the disciplinary process, ABA Standard 9.22(f), and refusal to acknowledge the wrongful nature of misconduct, ABA Standard 9.22(g). The substance of the allegation against respondent is that he acted in a deceptive manner during the disciplinary process and, inferentially, that he refused to acknowledge the wrongful nature of his misconduct in that matter. Thus, considerations arising from those factors are inherent in our determination that he violated RPC 8.1(a)(1). *See In re Maurer*, 364 Or 190, 204, 431 P3d 410 (2018) ("wrongful nature of conduct" factor does not apply to lawyers seeking to defend themselves against charges; by contrast, it may apply when a lawyer admits the Bar's factual allegations in nearly all material respects but continues to claim that the conduct was not blameworthy or detrimental).

Or at 222-23 (discussing impact of failure to respond on disciplinary system).[17]

Nonetheless, other cases involving misrepresentations during the disciplinary process do suggest that a suspension is appropriate. Unlike this case, though, other cases also have involved underlying misconduct, resulting in longer suspensions or even disbarment. *See, e.g.*, *Lawrence*, 337 Or 450 (90-day suspension for lawyer who concealed details of her contact with alleged victim from both the trial court and the Bar); *Worth*, 336 Or 256 (90-day suspension for lawyer who made false statement during Bar investigation but also had neglected client matters and failed to return client property); *Huffman*, 331 Or 209 (two-year suspension for lawyer who made false statements about his assets to Bar investigator; lawyer also made misrepresentation in filing motions to waive or defer filing fees and transcript costs); *Brandt/Griffin*, 331 Or 113 (12- and 13-month suspensions for lawyers who misrepresented an underlying fact to the Bar, but also failed to avoid making misrepresentations to client, had lack of candor in dealings with client, and failed to avoid conflicts of interest); *In re Leonhardt*, 324 Or 498, 930 P2d 844 (1997) (disbarment imposed on former DA convicted of crimes, who also abused grand jury process and made misrepresentations to court, Bar, and others).

Here, the Bar proved only false statements during the Bar's investigation, not underlying misconduct. Notably, though, respondents misconduct involved making multiple false statements, sent in three responses to an escalating inquiry over an extended period of time. And, although the Bar narrowed its own inquiry in that time—from asking whether respondent had engaged in a retaliatory investigation to asking about the nature of his focus on Morris during the DOJ investigation—respondent essentially repeated the

---

[17] The Bar also cites cases involving the execution of false documentation. *See In re Wyllie*, 327 Or 175, 957 P2d 1222 (1998) (two-year suspension; lawyer had misrepresented his CLE activities in an MCLE report and then lied to the Bar about it); *In re Yacob*, 318 Or 10, 860 P2d 811 (1993) (disbarment; lawyer had presented fabricated documents to Bar in response to inquiry); *In re Brown*, 298 Or 285, 692 P2d 107 (1984) (two-year suspension; lawyer had knowingly prepared and had client sign a false affidavit, to persuade Bar to drop its investigation). The misconduct involved in those cases does not provide a useful analogy to respondent's false statements in this case.

same false responses, demonstrating a continuing obstinance toward the Bar's inquiry.

In making four false statements during the Bar's investigation, respondent contravened expectations for lawyer conduct, as well as his obligation to the legal profession to respond truthfully during a disciplinary inquiry. *See In re Hiller*, 298 Or 526, 534, 694 P2d 540 (1985) ("A person must be able to trust a lawyer's word[,] as the lawyer should expect his [or her] word to be understood, without having to search for equivocation, hidden meanings, deliberate half-truths or camouflaged escape hatches."). We conclude that the appropriate sanction is a 60-day suspension.

Respondent is suspended from the practice of law for 60 days, commencing 60 days from the date of filing of this decision.