Argued and submitted January 9, accused suspended from the practice of law for 63 days commencing on the effective date of this decision dated September 24, 1992

# In re Complaint as to the Conduct of

## David DINERMAN,
*Accused.*

### (OSB 87-58; SC S37986)

840 P2d 50

Martha M. Hicks, Assistant Disciplinary Counsel, Oregon State Bar, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

Norman Sepenuk, Portland, argued the cause and filed the brief for the accused.

PER CURIAM

## PER CURIAM

This is a disciplinary proceeding instituted by the Oregon State Bar, charging in two causes of complaint that the accused engaged in conduct that violated standards of professional conduct. The Bar's first cause of complaint charges the accused with violating *former* DR 1-102(A)(3)[1] (now DR 1-102(A)(2)) (illegal conduct involving moral turpitude), *former* DR 1-102(A)(4)[2] (now DR 1-102(A)(3)) (conduct involving dishonesty, fraud, deceit, or misrepresentation), and DR 7-102(A)(7)[3] (conduct involving counseling or assisting the lawyer's client in conduct that the lawyer knows to be illegal or fraudulent). The Bar's second cause of complaint charges the accused with violating *former* DR 1-102(A)(4)[4] (now DR 1-102(A)(3)) (illegal conduct involving moral turpitude) and DR 7-102(A)(7)[5] (conduct involving counseling or assisting the lawyer's client in conduct that the lawyer knows to be illegal or fraudulent).

The trial panel found the accused guilty of violating all three disciplinary rules with respect to the first cause of complaint and not guilty of violating either disciplinary rule with respect to the second cause of complaint. The panel imposed a reprimand. The Bar seeks review of the sanction, arguing that a four-month suspension would be appropriate. The Bar does not seek review of the trial panel's findings with

---

[1] *Former* DR 1-102(A)(3) provided:

"A lawyer shall not:

"* * * * *

"(3) Engage in illegal conduct involving moral turpitude."

[2] *Former* DR 1-104(A)(4) provided:

"A lawyer shall not:

"* * * * *

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

[3] DR 7-102(A)(7) provides:

"In his representation of a client, a lawyer shall not:

"* * * * *

"(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

[4] *See supra*, note 2.

[5] *See supra*, note 3.

respect to the second cause of complaint. The accused did not seek review, but argues in response to the Bar's petition that the accused did not violate disciplinary rules and that, should a violation be found, the sanction should be at the lowest level possible.

We review *de novo*. ORS 9.536(3); BR 10.6. The Bar has the burden of establishing a violation of disciplinary rules by clear and convincing evidence. BR 5.2; *In re Anson*, 302 Or 446, 453, 730 P2d 1229 (1986). We find the accused guilty of violating *former* DR 1-102(A)(3), *former* DR 1-102(A)(4), and DR 7-102(A)(7), and suspend him from the practice of law for a period of 63 days.

## FINDINGS OF FACT

We adopt the trial panel's findings of fact as clarified by the material in brackets (citations to the record omitted):

"1.   At all time[s] relevant hereto[,] the Accused * * * was an attorney at law licensed to practice in the State of Oregon, having his office and principal place of business in Lane County.

"2.   The Accused was employed by Gregory Harsch, a real estate developer who operated through several organizations: The Empire Financial Service, Inc., First Mark Real Estate Investors, Inc., and the Harsch Construction and Development Company (HCDC). Mr. Harsch and these entities will be referred to as Harsch. From September[,] 1980[,] until June, 1982, and again beginning in June, 1983, the Accused was employed as in-house counsel by Harsch.

"3.   In the course of his real estate development business, Harsch borrowed money from the Emerald Empire Bank (Bank).

"4.   In June, 1982, the Bank had reached or was approaching its lending limits to Harsch. These lending limits prohibit the Bank from placing too many loans with any one borrower. To avoid these lending limitations, the [President of the] Bank and Harsch devised a scheme whereby the Bank would make loans to other persons for the benefit of Harsch. These are so-called straw loans. Both the [President of the] Bank and Harsch were aware of the nature of these loans.

"5.   In June, 1982, the Accused signed a promissory note, a security agreement and a nominee agreement. The

terms of the promissory note were that the Accused borrowed, and agreed to repay the sum of $10,000 from and to the Bank. In the security agreement the Accused stated that he was the owner of a Minolta Copier and pledged the copier as security for the loan. In fact, the Accused was not the owner of the copier. Harsch was the owner of the copier and the [President of the] Bank knew this. In the nominee agreement the Accused agreed with Harsch that he was taking out the loan as agent for Harsch and for the benefit of Harsch. Harsch agreed that he would either repay the loan directly to the Bank or would reimburse the Accused if he were required to make payment to the Bank.

"6. In 1985 the Bank sued the Accused on the note. The Accused defended and pleaded as an affirmative defense that the loan was made for the purpose of complying with, or circumventing lending limits. The Accused was found liable, judgment was entered, and the Accused has satisfied the judgment.

"7. To finance his real estate development, Harsch used what has been labelled the LOB/LOT financing plan. Under this plan Harsch constructed houses for renters who had options to purchase the property. The renters took out construction loans and signed promissory notes. However, the renters did not receive these loans. The proceeds were paid by the Bank directly to Harsch. The idea was that after the houses were constructed, the construction loans would be replaced by permanent loans and new promissory notes secured by trust deeds would be signed. When the FDIC moved in, many houses were not constructed and the construction borrowers were held liable on the construction notes even though they had not received the benefits of the loans. The Accused did not devise this LOB/LOT financing plan. The extent of participation by the Accused, which was proved, was that he signed earnest money agreements with the construction borrowers on behalf of Harsch pursuant to a general power of attorney. When the FDIC sought to hold the construction borrowers liable, the Accused advised them they might be able to avoid liability because the loans were made to avoid [] the lending limitations on the Bank. The Accused states, and there was no evidence to the contrary, that he did not learn of these limitations or that these limitations had been exceeded until after any participation he had in the plan. The Accused did not know at the time he signed the earnest money agreements that sales or loans were being made in violation of lending limitations. The

Accused counseled his mother to become involved in the plan, as a construction borrower, and she was held liable on a construction loan."

## DISCIPLINARY RULES VIOLATED

### A. *Former* DR 1-102(A)(3)

*Former* DR 1-102(A)(3) provided that a lawyer shall not engage in illegal conduct involving moral turpitude. Conviction of a crime is not a prerequisite for violation of *former* DR 1-102(A)(3). *In re Anson, supra*, 302 Or at 453. The Bar argues, and the trial panel found, that the accused violated 18 USC § 1014[6] and 18 USC § 656,[7] either directly or by aiding, abetting, or conspiring with others to violate 18 USC § 656.

It is unlawful knowingly to make any false statement for the purpose of influencing in any way the action of a bank insured by the FDIC on any application, commitment, or loan, or on any change or extension by renewal of the application, commitment, or loan. 18 USC § 1014. The accused denies making a false statement for the purpose of influencing the bank.

---

[6] 18 USC § 1014 (1988) (which had not been amended in any way relevant to this case since 1982) provided in part:

"Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of * * * any bank the deposits of which are insured by the Federal Deposit Insurance Corporation, [or] any member of * * * the Federal Deposit Insurance Corporation * * * upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both."

[7] 18 USC § 656 (1988) (which had not been amended since its enactment in 1948) provided in part:

"Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

■ We find that the accused knowingly made false statements in two particulars. First, the accused signed a promissory note for a $10,000 loan, which the accused acknowledges was a straw loan entered into as a way for Harsch to receive more than the bank's lending limits would otherwise allow, by stating in the promissory note that the loan was made to the accused. The accused argues that, notwithstanding his agreement with Harsch and the bank president that Harsch would be looked to first for repayment, the accused was still liable on the note.

The accused knew that the reason for the straw loan was to avoid the bank's lending limits, and the evidence in the record establishes that he believed that he would *not* be personally liable on the note. He entered into a nominee agreement with Harsch, which provided that Harsch was liable for the note that the accused had signed. The accused stated in his deposition that, when he was asked to enter into the arrangement with the bank president and Harsch, he "was told that the bank was using this as a way to avoid their legal lending limits, and that they would not be looking to me for repayment." Further, when the FDIC sought to recover on the note in a civil action against the accused, the accused responded with an affirmative defense, which stated in part:

> "[The note at issue] was prepared and received by [the bank] with the full knowledge and understanding that the document represented the indebtedness of some party other than the [accused]. * * *
>
> "* * * * *
>
> "No debt, or other obligation, was ever entered into between the [accused] and [the bank]. * * *
>
> "The previously described document was requested by [the bank] for the purpose of complying with, or circumventing, the lending limits governing all loan activities engaged in by [the bank]. * * *
>
> "At all material times, [the bank] was aware that the underlying loan obligation represented by the previously described promissory note was not an obligation of the [accused], and the [bank] expressly agreed not to look to the [accused] for repayment of this obligation."

We find that the accused's signature on the promissory note was a knowingly false statement about his intention to be bound by the terms of that note.

Second, in support of the promissory note, the accused signed a security agreement in which the accused stated that he was the owner of a Minolta copier and pledged the copier as security for the loan. The accused acknowledges that he did not own the copier, so that the statement was false, but argues that he was not aware that the security agreement pledged the copier. We do not find to be credible the accused's claim that he was simply negligent in not reviewing the security agreement more closely or that the inclusion of Harsch's copier as an item owned by the accused was a mere scrivener's error.

The purpose of the entire transaction was to avoid the bank's lending limits to Harsch. Listing collateral owned by Harsch under the accused's name in a pledge agreement may have aroused the suspicion of others examining the document. The accused did not intend to be personally liable on the note, and the evidence does not support the accused's claim of simple negligence regarding the security agreement. The accused entered into the transaction carefully and deliberately, even drafting and signing a nominee agreement with Harsch in an attempt to shield the accused from liability. By his own admission, the accused was aware that the bank's documentation of other loans was sometimes poor. It is highly likely, therefore, that the accused reviewed these documents carefully. We find that the accused knew that the security agreement contained a false statement when he signed it.

■ The accused then argues that he did not violate 18 USC § 1014 because the statements in the promissory note and security agreement were not made to influence the actions of the bank. The record supports the accused's claim that the bank president and Harsch devised this scheme to avoid the bank's lending limits and that they asked the accused to sign the note and the security agreement. The note and the agreement were not in any way the accused's idea, and he was aware that the bank president and Harsch both approved of the plan.

The reality is, however, that the bank would not have entered into another loan with Harsch under Harsch's name and that the conduct of the accused influenced the bank to enter into a loan on Harsch's behalf. The accused's participation in the scheme persuaded the bank to do something that it would not otherwise have done. Further, the accused testified that the arrangement was made because the bank president could not loan Harsch more money without loan committee approval and for the purpose of making the bank books look better. The scheme was intended either to prevent the loan committee from reviewing the transaction or to convince the loan committee or others that the loan was something that it was not. We find that the accused made the false statements in the promissory note and security agreement for the purpose of influencing the action of the bank in violation of 18 USC § 1014.

■      We further find that the illegal conduct involved moral turpitude. The conduct was intentional and involved false statements and dishonesty. *See In re Chase*, 299 Or 391, 400-02, 702 P2d 1082 (1985) (discussion of moral turpitude). The accused violated *former* DR 1-102(A)(3).[8]

B.  *Former* DR 1-102(A)(4)

■      *Former* DR 1-102(A)(4) provided that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. The Bar argues that the accused's conduct involved dishonesty and misrepresentation, and we agree. In determining that the accused violated 18 USC § 1014, we found that the accused made knowingly false statements to influence the actions of the bank. Those statements were dishonest and misrepresented the truth. The fact that the bank president and Harsch requested and approved of the

---

[8] 18 USC § 656 provides that it is unlawful for a bank officer willfully to misapply the bank's money. *See supra*, note 7. The Bar argues that the accused aided or abetted or conspired with the bank president and Harsch willfully to misapply the bank's money by entering into the straw loan. We have found that the accused knowingly made false statements, but that he did not design or suggest the plan involving the straw loan. Under those circumstances, a violation of 18 USC § 656 would be based entirely on the same conduct that we have found to violate 18 USC § 1014 and would not be more culpable. The accused violated *former* DR 1-102(A)(3) by violating 18 USC § 1014; an additional violation of 18 USC § 656 would not affect the sanction under the circumstances of this case. Therefore, we decline to address whether the accused aided or abetted or conspired with a violation of 18 USC § 656.

false statements does not make the statements any the less false. The disciplinary rules govern the conduct of lawyers; misconduct is not something other than misconduct when it is approved by others. The accused violated *former* DR 1-102 (A)(4).

## C. DR 7-102(A)(7)

■ DR 7-102(A)(7) provided that, in a lawyer's representation of a client, a lawyer shall not assist the client in conduct the lawyer knows to be illegal or fraudulent. The accused argues that, although he knew that the promissory note was an attempt to avoid lending limits, he did not know that those lending limits were set by law and either did not think about it or assumed that the limits were imposed by the bank. The accused did testify that it "crossed his mind" that the transaction might be illegal, but there is not clear and convincing evidence that the accused knew that it was illegal.

We find that the accused knew that obtaining a straw loan by having a party who would not be looked to for repayment sign as obligor was fraudulent and that he assisted his client, who was also his employer, in that conduct. *See In re Hockett*, 303 Or 150, 157-58, 734 P2d 877 (1987) (defining fraud in the disciplinary rule as fraud that would be actionable in Oregon in a tortious sense); *Rice v. McAlister*, 268 Or 125, 128, 519 P2d 1263 (1974) (setting forth elements of fraud). The accused violated DR 7-102(A)(7).

## SANCTION

■ In deciding the appropriate sanction, this court refers for assistance to the American Bar Association Standards for Imposing Lawyer Sanctions (ABA Standards). *In re Recker*, 309 Or 633, 639-40, 789 P2d 663 (1990). ABA Standards 3.0 sets out the factors to consider: the duty violated, the lawyer's mental state, the potential or actual injury caused by the misconduct, and the existence of aggravating or mitigating factors. The trial panel in this case issued a reprimand, and the Bar requests that a four-month suspension be imposed.

The accused's conduct represents a failure to maintain personal integrity. ABA Standards 5.1. The accused acted intentionally, the most culpable mental state, ABA

Standards at 6, in making false statements, and he intended the false statements to influence the actions of others.

The potential injury based on the accused's conduct was a $10,000 loss to the bank. The lending limits that the accused helped to circumvent are designed to protect the bank from making bad loans. Security requirements for loans, which the accused helped violate, protect a bank by providing collateral from which the loan can be collected in the event of default. In this case, the accused helped Harsch receive $10,000 over the lending limit without intending to be held personally liable in the event of Harsch's default. The bank eventually failed. In the process, the accused resisted repaying the $10,000, although he ultimately did enter into a settlement to satisfy the judgment against him, which by that time included the $10,000 principal, $5,000 in interest, and $19,000 in legal fees. The accused, of course, is not solely responsible for the bank's failure, but bank failure is one type of injury that the rules violated were intended to prevent. We consider the injury to be serious.

The pertinent ABA Standards suggest that suspension is the appropriate sanction in this situation. *See* ABA Standards 5.12 (criminal conduct that seriously adversely reflects on lawyer's fitness to practice). There are aggravating circumstances. *See* ABA Standards 9.22 (listing aggravating circumstances). The accused's motive was dishonest, although not selfish. In addition, although the accused argues now that he was liable on the promissory note and that he understood at the time of signing the note that he was personally liable, in the interim the accused defended against a civil action to recover on the note by claiming that he was not personally liable.

There are also mitigating factors. *See* ABA Standards 9.32 (listing mitigating circumstances). The absence of a prior disciplinary record is a mitigating factor, although this factor is of limited significance because the accused had recently entered into the practice of law. The record reflects the accused's cooperative attitude toward the proceedings, his evident remorse for the mistakes that he made, and his demonstrated upstanding character and reputation. The remoteness in time from the offenses and the delay in bringing them to disciplinary action is unfortunate, although the

accused's intervening defense against the civil action involving the same conduct appears likely to have been a factor in the delay. The facts that the misconduct occurred ten years ago and that he has practiced law since that time with no disciplinary violations of which we have been made aware reflect positively on his fitness to practice law.

The seriousness of the accused's conduct, taken in the context of the aggravating and mitigating factors, calls for a suspension of 63 days. *See In re Magar*, 312 Or 139, 817 P2d 289 (1991) (60-day suspension imposed for dishonesty in endorsing a draft without authorization); *In re Hiller*, 298 Or 526, 694 P2d 540 (1985) (four-month suspension for failure to disclose to the court that transfer of title to real estate was *pro forma* only).

The accused is suspended from the practice of law for a period of 63 days commencing on the effective date of this decision. The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.536(4).