350 September 25, 2025 No. 41

# IN THE SUPREME COURT OF THE STATE OF OREGON

In re:

Complaint as to the Conduct of

Gregory Mark Abel,
OSB No. 031784,
*Respondent.*

(OSB 2366) (SC S071019)

En Banc

On review of the decision of a trial panel of the Disciplinary Board.*

Argued and submitted February 27, 2025.

David J. Elkanich, Buchalter, Portland, argued the cause and filed the briefs for respondent. Also on the briefs was David A. Bernstein.

Susan R. Cournoyer, Assistant Disciplinary Counsel, Tigard, argued the cause and filed the answering brief on behalf of the Oregon State Bar.

PER CURIAM

Respondent is suspended from the practice of law for 30 days, commencing 60 days from the date of filing of this decision.

_____

* Trial panel opinion dated March 11, 2024.

## PER CURIAM

The Oregon State Bar charged respondent with a single violation of Rule of Professional Conduct (RPC) 8.4(a)(3) (professional misconduct to engage in misrepresentation that reflects adversely on lawyer's fitness to practice law), relating to statements that he made in a demand letter. A trial panel of the Disciplinary Board determined that respondent had made a knowing, material misrepresentation, and it suspended him from the practice of law for 90 days. On review, respondent argues that the Bar did not prove the alleged violation because it did not sufficiently prove that he had acted with knowledge; he alternatively argues that a public reprimand is the appropriate sanction. We conclude that the Bar proved the alleged violation of RPC 8.4(a)(3), and we suspend respondent for 30 days.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

We review the record *de novo*. Bar Rules of Procedure (BR) 10.6. Upon doing so, we may adopt, modify, or reject the decision of the trial panel. *Id.* Except as to respondent's mental state at the time of the conduct in question, the facts are essentially undisputed.

Respondent was admitted to the Oregon State Bar in 2003, after practicing for several years in Washington State. Since 2005, he has been a partner in his current firm, focusing on both civil practice and criminal defense primarily in Jackson County.

In July 2021, respondent began a *pro bono* representation involving a financial dispute between two brothers, Mark, respondent's client, and Jon. The dispute arose from an insurance payout following the destruction of the brothers' deceased mother's home in the Almeda forest fire in September 2020. Before their mother's death, Mark already had lived in the home for several years, and his mother at some point had added him to the title. After she died, in 2019, Mark continued living in the home, and he lost all his belongings in the fire. At that time, both Mark and his mother (but not Jon) were the named insureds on the homeowner's policy; Jon, however, had been making payments on the policy.

Almost a year later, Mark—who by that time was in a dire financial situation and without permanent housing—sought assistance regarding the homeowner's policy from a local legal aid program, which referred the case to respondent *pro bono*. Mark told respondent that he had tried to file an insurance claim, but the insurance company had told him that—although only he and his mother were the listed named insureds—Jon had already filed a claim. Then, in September 2020, the company had sent two checks to Jon in Washington State, issued collectively to Mark, Jon, and their mother (for $455,224.15 and $19,350.00, respectively). Mark told respondent that Jon then had come to Oregon and taken Mark to the bank where Jon and their mother—before her death—had established a joint account. Jon had printed the mother's name on the checks, noting "deceased," and also had Mark endorse the checks, and then deposited them into the joint account. At some point in time, Mark learned that the home ownership had changed before his mother died to a joint tenancy held by Jon and their mother (but not Mark), with a right of survivorship to Jon, but the record does not show that Mark ever told respondent about that change. Mark brought to a meeting with respondent copies of both the insurance checks and his communications with the insurance company. Respondent, in turn, told Mark to contact local law enforcement, to report Jon's actions.

Respondent next took steps to verify the information that Mark had provided. He located a small estate probate filing for the mother, filed by Jon, but it had not listed the home and had not been amended to list the insurance checks, which respondent thought would have been required, because the mother had been named as a beneficiary on the checks issued after her death.[1] He also called the insurance company and verified that the checks had been issued to Jon, Mark, and their mother, and that they had cleared. He did not, however, independently verify the home ownership status and so did not learn about Jon's joint tenancy and right of survivorship.[2]

---

[1] The mother's will had had disposed of all her property equally to Mark and Jon (with Jon as the personal representative).

[2] The record does not show when respondent learned about Jon's joint tenancy (if at all, prior to the trial panel hearing).

On or shortly after the date of his meeting with Mark, respondent dictated a demand letter to Jon, dated Tuesday, July 20, 2021. The letter explained that respondent's law firm represented Mark regarding the insurance payout on the policy on which Mark and his mother, but not Jon, were listed as named insureds. The letter then stated:

> "[Y]our seizure of the $455,224.15 check and the $19,350.00 check is Grand Larceny. We are preparing a file in cooperation with [Deputy District Attorney] Markiewicz of the Jackson County District Attorney's Office. Once we have assembled the file, Mr. Markiewicz will submit it to the Grand Jury for prosecution and be considered A-Felonies.[3]

> "This matter can be resolved by submitting $237,302.00 [(one-half of the insurance proceeds)] to this office by Monday, July 26, 2021. If we do not receive this amount by this deadline, we will proceed accordingly. In review of the checks, it also appears that the check[s] *** have the [mother's name] on them. Of course, it is a felony to sign the [mother's] name *** after she is deceased. *** It is a forgery to sign the name of a deceased person.

> "These are serious legal matters for which you should consult competent legal counsel immediately licensed in the State of Oregon. This amount of money cannot just walk away, and *we are in discussion with [the] Jackson County Sheriff's Office and the District Attorney's Office about proceeding in this case*. We have an obvious Civil Lawsuit but if you are Indicted by a Grand Jury first, our case becomes much easier. If you have retained counsel in this matter, please have them contact me immediately.

> **"THIS LETTER CONTAINS A REQUIREMENT THAT IF NOT MET WILL RESULT IN AN ACTION BEING FILED AGAINST YOU IN THE JACKSON COUNTY CIRCUIT COURT. IF YOU DO NOT MEET THE DEADLINE STATED ABOVE, THE SENDER WILL PROCEED AS INDICATED.**

> "HEREIN FAIL NOT"

(Boldface type in original; emphases added.)

Respondent "look[ed at]" the draft demand letter within the next two days, but did not review it carefully, as he

---

[3] At that time, Markiewicz was a Deputy District Attorney in Jackson County who was professionally acquainted with respondent.

was talking with his legal assistant at the same time about the preferred means of sending the letter.[4] He then signed the letter and emailed it to Jon; he also sent it through regular mail and had it hand-delivered by a process server.

Upon receipt of respondent's demand letter, Jon understood it to mean that a case already had been filed against him by the Jackson County District Attorney's Office, that he was being accused of several crimes, and that his arrest was imminent. He immediately wrote to the Jackson County District Attorney, Heckert, enclosing a copy of respondent's demand letter and asking whether it amounted to "extortion." When Heckert received Jon's inquiry, she asked Markiewicz whether he had communicated with respondent about the subject of the demand letter. Markiewicz then called respondent and confirmed that they had not spoken—at all—about Mark's claims against Jon prior to respondent having sent his letter. Markiewicz and respondent also discussed the standard protocol in Markiewicz's office, to the effect that citizen complaints are first taken to law enforcement for investigation.[5]

Markiewicz summarized his call with respondent to Heckert, who then wrote back to Jon. Heckert told Jon that respondent never had approached the district attorney's office; that that office was not "working in cooperation" with respondent or Mark; and that the district attorney's office responded only to law enforcement inquiries.[6] Heckert's letter also opined that respondent's demand letter had made implications that were "not factually accurate"; that she found the letter to be "very unprofessional and misleading"; and that Jon could complain to the Bar if he thought that respondent's conduct had been unprofessional.

---

[4] Respondent testified that he did not "actually have an independent memory of reading the letter," but he did remember signing it.

[5] Respondent thereafter again tried to persuade Mark to report the incident to law enforcement, and respondent also spoke to both the sheriff's office and a local police department -- but was told that law enforcement must speak directly with Mark.

[6] Specifically, Heckert stated that Mark could report the events to a law enforcement agency; that agency would investigate and then submit a report to her office; a deputy district attorney then would review and decide if a crime could be proved; if so, and if the case involved a felony, it would be presented to a grand jury.

Jon then filed a grievance with the Bar, which ultimately resulted in the Bar filing a formal complaint against respondent, in April 2023. The Bar's complaint alleged a single violation of RPC 8.4(a)(3), based on the following statements from respondent's demand letter:

- Jon's "seizure" of the checks was "Grand Larceny";

- "We are preparing a file in cooperation with [Deputy District Attorney] Markiewicz of the Jackson County District Attorney's Office."

- "Once we have assembled the file, Mr. Markiewicz will submit it to the Grand Jury for prosecution and be considered A-Felonies."

- "This amount of money cannot just walk away, and we are in discussion with [the] Jackson County Sheriff's Office and the District Attorney's Office about proceeding in this case."

A trial panel hearing was held in December 2023, at which respondent represented himself and testified extensively. Respondent acknowledged that, at the time when he had dictated and sent the demand letter, he had not yet conferred with Markiewicz about filing charges and had not himself begun to contact law enforcement, but had told Mark to do so before (and after) sending the letter. He described the situation as having been "rushed" and the letter as not "well thought out" and using poor grammar. He explained that he had drafted the letter "how I talk"—as in, he described "this is what's happening, but in a prolonged sense, not in *** a presen[t] sense." Specifically, when he made the statements that the Bar identified in its complaint, he meant to describe what "would happen" in due course—that is, he would work with the district attorney's office to assess whether charges should be filed; if so, that office would present to a grand jury; and the resulting charges likely would involve A-level felonies or what he colloquially had described as "Grand Larceny." Respondent also explained that he had mentioned Markiewicz specifically because he had recently spoken with him about an unrelated matter. And he testified that his purpose in drafting and sending the letter was twofold—to prompt Jon to consult counsel,

so that respondent could engage with that counsel, and to move quickly toward obtaining relief for Mark.[7]

The trial panel concluded that respondent had violated RPC 8.4(a)(3) as alleged—that is, that he had made knowingly false and material misrepresentations that reflected adversely on his fitness to practice. In doing so, the trial panel assessed respondent's testimony about his admittedly clumsy wording in the demand letter, but it made no express credibility finding. Rather, the panel concluded that the actual words that respondent used—which the panel characterized as containing "significant threats"—had been knowingly false when made and that "any reasonable person" would have understood that the described actions in fact had been taken and that the described events either had occurred or shortly would occur. The panel further concluded that, even if, as respondent had testified, he meant to convey only a threatened action in the future, that did not matter to the panel's assessment under RPC 8.4(a)(3). That was so, the panel explained, because analyzing the meaning of respondent's statements involved an "objective" inquiry, rather than a "subjective" one—focusing on what a reasonable person would have understood respondent's words to mean. The panel ultimately imposed a 90-day suspension. Respondent then requested review in this court.

## II.   MISCONDUCT ALLEGATION

RPC 8.4(a)(3) provides that it is professional misconduct for a lawyer to "[e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law[.]" We have explained that, under that rule, "[a]n affirmative representation amounts to a misrepresentation" if it is false, knowingly made, and material—that is, if it would or could significantly influence the recipient's decision-making process. *In re Herman*, 357 Or 273, 287, 348 P3d 1125 (2015) (internal quotation marks omitted). The parties' dispute focuses on whether the statements in respondent's demand letter, as identified in the Bar's complaint, were knowingly made. The Bar must establish the alleged misconduct, including the knowing requirement, by clear and convincing evidence,

---

[7] We discuss those aspects of respondent's testimony in greater detail below.

BR 5.2, which means evidence that "the truth of the facts asserted is highly probable," *In re Nisley*, 365 Or 793, 801, 453 P3d 529 (2019) (internal quotation marks omitted).

On review, respondent again acknowledges that the key disputed statements in his demand letter were inaccurate—that is, at the time when he wrote the letter, he (1) had not yet consulted with the Jackson County District Attorney's Office or otherwise with Markiewicz; (2) had no information about whether Markiewicz would submit his allegations to a grand jury for consideration of A-felony charges; and (3) had not yet spoken to the Jackson County Sheriff's Office. And, importantly, he also acknowledges that he knew at that time that those actions and events—as described by the actual words that he had used in his letter—had not in fact occurred (and might never occur).

But, relying on his own testimony about what he had meant to convey—to describe what would happen in the future—he contends that the Bar did not satisfy its burden of proof as to the "knowledge" requirement of RPC 8.4(a)(3), for two reasons. First, he asserts, the trial panel incorrectly applied an objective standard to the question whether he had "knowingly" made false statements, when a subjective, "actual knowledge" standard should instead apply. Second, he continues, when a subjective standard is correctly applied, his uncontroverted testimony established that he did not act with knowledge. For its part, the Bar does not appear to disagree that "actual knowledge" is required; instead, it contends that, when respondent's testimony is weighed against the actual words used, coupled with other supporting facts in the record, the Bar sufficiently proved that he had acted with actual knowledge.

We begin by noting our agreement with the parties that a knowing misrepresentation under RPC 8.4(a)(3) requires actual knowledge. As background, although that rule itself does not set out any accompanying mental state, this court long has construed what is now RPC 8.4(a)(3) to require the Bar to prove a "knowing" mental state, such that inadvertent false statements do not violate the rule. *See In re Skagen*, 342 Or 183, 203-04, 149 P3d 1171 (2006) (explaining that reckless conduct may breach the lawyer-client contract,

but does not violate rule); *In re Sassor*, 299 Or 570, 576, 704 P2d 506 (1985) (lawyer who knew that he had no authority to endorse a check engaged in misrepresentation, even if he did not intend to keep the proceeds). And significantly, when assessing relevant proof, the court's inquiry focuses on the lawyer's intended meaning or actual knowledge at the time of making the disputed statement. *See Nisley*, 365 Or at 805 (court's inquiry required determining the "intended meaning" of lawyer's disputed statements); *In re Fitzhenry*, 343 Or 86, 103, 162 P3d 260 (2007) (inquiry focused on what lawyer "actually knew" when he made the disputed statements); *In re Merkel*, 341 Or 142, 150, 138 P3d 847 (2006) (in assessing competing inferences that may be drawn from lawyer's ambiguous statements, court must determine what lawyer "meant to convey"); *In re Lawrence*, 337 Or 450, 470, 98 P3d 366 (2004) (in context of lawyer's truncated statement in response to the Bar's inquiry, when a "*full*[]" response was required, court must determine what the lawyer knew "in her own mind" and whether she knew that she had omitted material facts that would have informed the Bar's assessment of her conduct (emphasis in original)). Stated another way, the "knowledge" requirement asks whether the lawyer had actual knowledge, in their own mind, that the disputed statement was false when made. It does not ask what a reasonable person would have understood the statement to mean. *See also generally* RPC 1.0(h) (defining "knowingly," "known," or "knows"—when used within the Rules of Professional Conduct—as "denot[ing] actual knowledge of the fact in question," which may be inferred from the circumstances).

The key question, therefore, is whether the Bar proved by clear and convincing evidence that respondent had acted with actual knowledge when he made the false statements in his demand letter. Here, the parties' arguments diverge. Respondent relies primarily on his testimony about what had been in his mind when he dictated and sent the demand letter—that he had meant to communicate what "was *going* to happen" (if no settlement were reached) in the future and that his primary goal had been for Jon to consult counsel. (Emphasis added.) He emphasizes that no other evidence addressed what actually had been in his own mind at the time; that the trial panel made no adverse credibility

finding respecting his testimony; and, ultimately, that the panel gave credence to his testimony when it concluded that a reasonable person nonetheless would have understood his statements to mean something different from what he had meant. For its part, the Bar relies on the actual wording of respondent's statements, viewed in the context of the entire demand letter and other parts of the record, to assert that it sufficiently proved that respondent's testimony about what he had meant to convey was not believable and, to the contrary, he had meant to falsely convey to Jon that a prosecution effort was well underway when he knew that none of the described steps in fact had been taken.

Our case law provides a framework for assessing whether the Bar sufficiently proved that respondent had acted with actual knowledge, when respondent testified to contrary. First, in the absence of credibility findings from the trial panel, we may assess subjective factors that are observable from the record—for example, whether a lawyer testified in an evasive as opposed to a candid manner. *See In re Walker*, 293 Or 297, 303, 647 P2d 468 (1982) (so demonstrating). And, if the panel did enter credibility findings, to the extent that the record permits, we also may assess any observable subjective factors. *See Fitzhenry*, 343 Or at 104 (confirming, "even on a cold record," the trial panel's subjective credibility assessment—in that the lawyer's testimony "often appeared evasive, hyper-technical, argumentative, and guarded").

Second, regardless of whether any credibility finding were made,

> "[a]s part of our *de novo* review in disciplinary cases, we can and do assess credibility based on objective factors, such as the inherent probability or improbability of testimony, whether testimony is internally consistent or inconsistent, whether the testimony is corroborated or contradicted, and so on."

*Id.* That is, we independently review the record to make credibility determinations when needed, based on a variety of objective factors.[8]

---

[8] *Fitzhenry* includes a helpful discussion about assessing trial panel credibility findings (as noted, though, the trial panel here did not make any credibility findings). *See* 343 Or at 103 n 13 (when trial panel has made express

*Fitzhenry* provides a useful example. That case involved an allegation that a private company's general counsel had made a knowing misrepresentation when he signed a management representation letter that contained false statements about a particular transaction. *Id.* at 88-89. The lawyer had testified to the trial panel that he had reviewed the letter for only the limited purpose of confirming legal issues and had not had "in mind" details about the particular transaction when he signed; he also denied having known about the company's failure to secure a fixed purchase commitment regarding the transaction. *Id.* at 103-05. We reviewed relevant aspects of the record to assess the lawyer's testimony "given the context of the surrounding circumstances," ultimately relying on several objective considerations to determine that certain aspects of his testimony had not been believable. *See id.* at 104-06 (evidence showed "flurry of special efforts" that the lawyer and others had made to secure a stronger purchase commitment; management letter had conspicuously listed the disputed transaction, such that the lawyer could not have failed to see it, particularly given that it undeniably had involved a legal issue); *id.* at 107 (it "defie[d] belief" that the lawyer could have seen the reference to the disputed transaction and not had "in mind" what he knew from his relatively recent involvement and his knowledge about the need to secure a commitment); *see also In re Long*, 368 Or 452, 472, 491 P3d 783 (2021) (agreeing with trial panel that lawyer's testimony was not credible, based on evidence that persuasively countered that testimony); *Lawrence*, 337 Or at 469 (based on other evidence, lawyer's testimony about her intended meaning of a purportedly false statement was "implausible"); *In re Dinerman*, 314 Or 308, 315-16, 840 P2d 50 (1992) (rejecting lawyer's claim that he had been "simply

demeanor-based credibility assessment, based on its own "subjective observations of a witness's demeanor and the manner in which the witness testifies," court defers to the panel's "superior position to assess credibility on that basis"); *see also In re Gustafson*, 333 Or 468, 470, 41 P3d 1063 (2002) (court gives weight to trial panel credibility findings, although lawyer's testimony that court deems credible can be sufficient to establish facts). However, when a trial panel makes a credibility assessment based on "objective factors involving the intrinsic believability of competing inferences or evidence -- *e.g.*, the inherent improbability of certain testimony, the existence of corroboration, and so on -- this court owes no deference to that assessment, but the panel's discussion may be enlightening and have persuasive force." *Fitzhenry*, 343 Or at 103 n 13.

negligent" in not more closely reviewing an agreement that he had signed and concluding, based on other evidence, that lawyer had knowingly made false statements to secure a loan for a client).[9]

We now apply that framework, to determine whether respondent acted with actual knowledge when he included the following false statements in his demand letter:

- "We are preparing a file in cooperation with [Deputy District Attorney] Markiewicz of the Jackson County District Attorney's Office."

- "Once we have assembled the file, Mr. Markiewicz will submit it to the Grand Jury for prosecution and be considered A-Felonies."

- "This amount of money cannot just walk away, and we are in discussion with [the] Jackson County Sheriff's Office and the District Attorney's Office about proceeding in this case."[10]

We begin with respondent's testimony. Respondent testified to the trial panel that the use in his demand letter of the present-tense—as in, "we *are preparing* a file" and "we *are in discussion* with" law enforcement and the district attorney's office—had meant to convey actions that would be taken in the future. (Emphases added.) As he put it:

"The word 'are.' It's how I talk. I've been saying for some time we are having a hearing on this matter. The hearing

---

[9] The Bar alternatively cites cases involving ambiguous statements and our framework for assessing competing inferences to determine a lawyer's intended meaning. *See Merkel*, 341 Or at 149-50 (to assess competing inferences, court may consider relative strength of each inference and may consider all surrounding circumstances, including reactions of others that may shed light on the reasonableness of each inference); *see also Nisley*, 365 Or at 808-09 (court rejected lawyer's proffered narrow reading of ambiguous statement, because surrounding context supported broader reading). But, unlike *Merkel* and *Nisley*, this case does not involve ambiguous statements. The actual wording of respondent's statements was not ambiguous, and respondent acknowledges that the actual words used were inaccurate and that he knew that to be so at the time. The question is whether the evidence establishes that respondent meant to convey the false message that the words themselves stated (as the Bar argues) or, instead, that he meant to convey a different message (as he argues).

[10] We mention the fourth statement noted in the Bar's complaint -- about the commission of "Grand Larceny" -- later below; on review, the Bar's primary focus is on the three statements just noted.

wasn't until today. It was true when I said it, and it's still true today.

"If I say to you[,] 'We are going to the West Coast Conference Tournament,' your question to me could be when, but it's still a correct statement. 'Are' can be used a lot of ways.

"And it wasn't \*\*\* well thought out, but it's how I talk. I was speaking \*\*\* into the dictation. I was speaking and thinking and trying to say this is what \*\*\*—talking to law enforcement, this is what's happening, but in a prolonged sense, not in a \*\*\* presen[t] sense."

He further testified:

"[T]he reason for dictating the letter the way I did is in the same mode in my head. That's exactly what I was thinking at the time. Here's what's going to happen. That's, in my mind, how I thought I said it. It wasn't sworn. It wasn't even reviewed very well, and it was sent out."

He relatedly explained that his use of "will"—as in, that Markiewicz "will" submit the matter to a grand jury for prosecution as A-felonies—was to a similar effect:

"'Will' is the same. 'Will' is not—if I had said 'this had happened,' that would be different. 'Will' means it's coming next. 'Will' is in the future."[11]

As respondent put it, the misunderstanding about what he had meant to convey reduced to "poor grammar."

As a subjective observation, and contrary to our assessment of the lawyer's testimony in *Fitzhenry*, nothing about respondent's testimony itself was "evasive" or "guarded." 343 Or at 104. Instead, his nature in testifying throughout the proceedings generally supported the notion that the less-than-precise wording used in his demand letter is "how [he] talk[s]."[12] But, as we will explain, once assessed against the actual wording of the false statements in his demand letter—importantly, viewed in the context of

---

[11] Respondent added that, although he specifically had named Markiewicz in his demand letter (because they had recently spoken about a different case), he just as easily could have generically referred to the district attorney.

[12] Respondent appeared both as a witness for the Bar in its case-in-chief and also as a witness for himself, in his defense.

the full letter and also in light of another objective consideration—respondent's testimony was not believable.

Respondent's demand letter began by reciting some preliminary information about his representation of Mark, the insurance policy, and the checks. It then asserted that Jon's "seizure" of the insurance checks was "Grand Larceny"—a crime that does not exist in Oregon, but that framed potential implications for Jon in strikingly serious terms. Indeed, the letter itself later expressly characterized the involved matters as "serious" and subject to indictment.[13] Next, the letter made the first two false statements set out above: that "we are preparing a file in cooperation" with Markiewicz and that, once "we have assembled the file, Markiewicz would present it to "the Grand Jury" for prosecution, to be considered "A-felonies." Building on the assertion that Jon had engaged in "Grand Larceny," those statements conveyed to Jon the false and threatening message that a prosecution effort was in fact underway.

Next, respondent's demand letter required payment of one-half the insurance proceeds, due within six days, or "we will proceed accordingly." Although the latter phrasing arguably suggests—as respondent testified—that he had meant to describe future events, the letter then immediately stated that it appeared that the checks had the mother's name on them and that it was a "forgery" to sign the mother's name on the checks after her death.

The demand letter then advised Jon to consult counsel, followed by the final false statement noted in the Bar's complaint—that respondent was in discussion with both the sheriff's office and the district attorney's office about proceeding accordingly. And the following sentence stated that, "if you are Indicted by a Grand Jury" before an "obvious" civil action moves forward, then "our case becomes much

---

[13] The Oregon Criminal Code now classifies what traditionally was treated as "larceny" as "theft" in varying degrees; the potential Oregon "crime" that respondent described was first-degree theft, ORS 164.015 (theft); ORS 164.055 (first-degree theft). Respondent acknowledged below that he had relied on a dictionary definition when choosing the words "Grand Larceny," and he did not dispute that Oregon does not have that crime. *See generally State v. Azar*, 372 Or 163, 175, 547 P3d 788 (2024) (legislature in 1971 eliminated "the traditionally distinct crime[] of larceny" and other crimes, "consolidat[ing] them into one crime called 'theft'").

easier." Collectively, those statements built upon the letter's earlier false and threatening statements—as the Bar puts it, "ratchet[ing] up the pressure" on Jon to immediately make payment, by misleading him into thinking that the Jackson County criminal justice system was being activated against him. Ultimately, respondent's letter closed with this urgent message, in boldface and uppercase type:

> **"THIS LETTER CONTAINS A REQUIREMENT THAT IF NOT MET WILL RESULT IN AN ACTION BEING FILED AGAINST YOU IN THE JACKSON COUNTY CIRCUIT COURT. IF YOU DO NOT MEET THE DEADLINE STATED ABOVE, THE SENDER WILL PROCEED AS INDICATED.**

> "HEREIN FAIL NOT"

(Boldface type in original.)

In sum, the full context of respondent's demand letter shows that he sought to misrepresent certain material facts about the criminal process to Jon, with the goal of increasing the pressure on Jon to make immediate payment to Mark. The letter did so by conveying a clear sense of urgency in relation to an impending criminal prosecution. And even if, as respondent argues, his goal was to prompt Mark to consult counsel, the letter viewed in full—including its structure in setting out repeatedly false statements and increasingly threatening and urgent wording—strongly supports the Bar's contention that respondent's testimony about having meant to describe only possible future events was not believable.

Other evidence in the record supports that assessment—namely, the fact that respondent was an experienced litigation attorney in both the civil and criminal arenas. He therefore would have understood the import of including wording that threatened criminal prosecution in a demand letter relating to a potential civil action, particularly when sent to a person whom he knew to be unrepresented. *See generally In re Hedrick*, 312 Or 442, 446, 822 P2d 1187 (1991) (court did not believe lawyer's testimony that probate petition inadvertently had referred to a "last will" when he had learned about a later will between preparation and filing of the petition; lawyer "*had* to have known" when he filed the

petition that it had falsely referred to a superseded will as the current will; lawyer's related failure to disclose the later will was inconsistent with his professed lack of knowledge (emphasis in original)).

Respondent points to an additional fact that he thinks supports his testimony about what he had meant to convey, relating to the haste with which he had prepared and sent the demand letter. Before the trial panel, he described having dictated the letter quickly and then returning to it a day or two later, when he saw it in a review basket. As he was "looking at" the letter, his legal assistant raised concerns about Mark's financial situation, and so their conversation turned to the appropriate means to quickly deliver the letter to Jon. At one point, respondent testified that he did not "actually have an independent memory of reading the letter," but he did remember signing it. Respondent described that entire situation as having been "rushed." We do not disbelieve that testimony, and we do not disagree that those circumstances arguably support respondent's argument about why he had been less than careful when he drafted the letter. But, at the same time, those circumstances are not dispositive as to what he meant to convey through his statements—that is, that he merely had meant to describe future events, as opposed to sending a knowingly false, threatening message to Jon.

After reviewing the record *de novo*, we are persuaded that respondent made knowingly false statements about an impending criminal prosecution in his demand letter, in an effort to convey that Jon needed to act immediately. More specifically, the actual words that respondent chose to use, coupled with other statements made throughout the letter, the manner in which he structured the letter, and its immediate and threatening tone—all viewed in light of respondent's extensive litigation experience—collectively lead us to conclude that the Bar proved by clear and convincing evidence that respondent had acted with actual knowledge when he made material statements that were false and that reflected adversely on his fitness to practice, in violation of RPC 8.4(a)(3). We turn to the question of sanction.

### III.   SANCTION

As noted at the outset, respondent seeks a public reprimand, but the Bar requests a 90-day suspension, as the trial panel imposed. In determining the appropriate sanction, we follow our methodology of applying the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards), first identifying the nature of the duty violated; respondent's mental state at the time of the violation; and the extent of any actual or potential injury caused by his misconduct, all to help assess a preliminary sanction. We then apply aggravating and mitigating factors to determine whether the preliminary sanction should be adjusted, followed by analyzing applicable case law. *Nisley*, 365 Or at 815. As explained below, we suspend respondent from the practice of law for 30 days.

A.   *Duty Violated*

In knowingly making the false and material statements in his demand letter, respondent violated his duty to the legal system, because he falsely communicated that aspects of the local criminal justice system already had been activated against Jon, in an effort to prompt an immediate favorable response. ABA Standard 6.0; *see also In re Leonard*, 308 Or 560, 571, 784 P2d 95 (1989) (stating, in misrepresentation case, that duty to maintain integrity in professional activities "is one of a lawyer's most basic obligations to the public").

B.   *Mental State*

We already have concluded that respondent acted with actual knowledge when he drafted and sent his demand letter containing false and material statements. *See also generally* ABA Standards at 17 (defining "knowledge" for purposes of sanction as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result"). As our discussion above confirms, respondent was consciously aware when he wrote his demand letter that it contained false, material statements, and he acted with actual knowledge when he nonetheless chose to include those statements in a letter structured to convey a false and threatening message to Jon.

## C.  *Injury*

In sending his demand letter containing knowing false and material statements, respondent caused actual injury to Jon. Jon testified that the letter had caused him considerable lack of sleep and that he had worried that his arrest was imminent; upon receipt, he immediately took steps to assess whether the information described was accurate. Respondent's misconduct also caused injury to the profession, because his tactics understandably caused Jon to perceive respondent's conduct as a member of the legal profession in a negative light. *See* ABA Standards at 7 (defining "injury").

## D.  *Preliminary Sanction*

The ABA Standards provide that suspension is generally appropriate when a lawyer "knows that false statements *** are being submitted to [a] court" and "causes injury or potential injury to a party to the legal proceeding," ABA Standard 6.12, but that reprimand is generally appropriate when a lawyer "knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation[,]" and that adversely reflects on the lawyer's fitness to practice law[,]" ABA Standard 5.13. Because respondent did not make knowing false statements to a court, we conclude that a reprimand is the appropriate preliminary sanction.

## E.  *Aggravating and Mitigating Factors*

The parties agree that two aggravating factors apply. First, respondent has substantial experience in the law—in both civil and criminal practice—having been licensed in Oregon since 2003 and in Washington since 1999. ABA Standard 9.22(i). In the context of the conduct at issue, which involved the selected wording for a demand letter in a civil action that encompassed multiple references to local criminal law processes, we give that factor significant weight.

Second, respondent has a prior disciplinary record—a 2018 complaint to which he stipulated to a public reprimand in 2019. ABA Standard 9.22(a). That complaint involved an allegation of current and former client conflicts, RPC 1.7(a); RPC 1.9(a), arising from a dependency

proceeding in which respondent had represented both the father and the mother (who had divergent interests) for about a month, including at an initial hearing, without seeking or obtaining written informed consent. *In re Abel*, 33 DB Rptr 175 (2019). Given the differing nature of that isolated instance of misconduct, for which respondent stipulated to a public reprimand, we give that factor little weight. *See In re Jones*, 326 Or 195, 200, 951 P2d 149 (1997) (in weighing prior offenses, court considers relative seriousness of prior offense and resulting sanction, similarity of offenses, number of prior offenses, relative recency of prior offense, and timing of earlier sanction in relation to new misconduct).

The trial panel also applied the "vulnerability of victim" aggravating factor, ABA Standard 9.22(h), because Jon had been unrepresented. We decline to apply that factor. Although he was unrepresented, Jon was an educated, highly trained professional who, upon receipt of a demand letter, was able to take action in response to the letter. His immediate response in contacting Heckert also shows that he had the knowledge and capacity to immediately reach out to the legal officer in the best position to advise whether the statements in respondent's demand letter were accurate. Simply stated, neither Jon's personal characteristics, nor any particular circumstances in the context of the case, rendered him a vulnerable victim under ABA Standard 9.22(h), notwithstanding his status as an unrepresented party. *See In re Spencer*, 355 Or 679, 700, 330 P3d 538 (2014) (rejecting Bar's argument that client had been a vulnerable victim because she was an "unsophisticated client in desperate financial circumstances"; client was not an unsophisticated purchaser and had owned property, worked as a comptroller, and regularly handled financial matters); *cf. In re Maurer*, 364 Or 190, 203, 431 P3d 410 (2018) (court applied factor when lawyer represented husband in acrimonious dispute with self-represented wife, who had a "somewhat fragile personality" (internal quotation marks omitted)); *In re Ramirez*, 362 Or 370, 377, 383, 408 P3d 1065 (2018) (applying factor when client was not legally sophisticated, had limited resources, was impaired by alcohol dependence, and needed immediate assistance).[14]

---

[14] Each party seeks application of an additional factor -- with the Bar urging that we apply the aggravating factor of refusal to acknowledge the wrongful

We apply one mitigating factor that the trial panel did not apply: the absence of a dishonest or selfish motive. ABA Standard 9.32(b). Respondent represented Mark on a *pro bono* basis; he genuinely thought that Mark was legally entitled to one-half of the disputed insurance proceeds; and, in drafting and sending his demand letter, he sought to set in motion a means of securing some financial relief for Mark as quickly as possible. Respondent had no financial or other personal interest at stake, and the record confirms that his intent was to act in what he thought was Mark's best interest. *See In re Gildea*, 325 Or 281, 298-99, 936 P2d 975 (1997) (applying factor when lawyer who violated several rules had acted throughout in good faith and had attempted to further his client's best interests at all times).

To summarize: We apply two aggravating circumstances—substantial experience in the practice of law and prior disciplinary record—giving the former significant weight, but the latter little weight. We also apply one mitigating circumstance, absence of a dishonest or selfish motive. On balance, those factors point to either a public reprimand or a short suspension.

F. *Case Law*

Our case law confirms that a short suspension is appropriate. For example, in *Leonard*, 308 Or at 571-72, we imposed a 35-day sanction on a lawyer who had violated the predecessor rule to RPC 8.4(a)(3), when he made a misrepresentation regarding a lease that he had modified after the new owners had signed it. We reasoned that the lawyer's "knowing" state of mind and selfish motive, and the owners' vulnerability, warranted a suspension, but several mitigating factors tempered the length. *Id.*; *see also Walker*, 293 Or at 308 (imposing 30-day sanction on lawyer who misrepresented to a court the status of a will; sanction warranted notwithstanding lawyer's motivation to protect the personal representative, as opposed to protecting himself); *In re Obert*, 336 Or 640, 649-52, 653-56, 89 P3d 1173

nature of the conduct, ABA Standard 9.22(g), and respondent urging that we apply the mitigating factor of full and free disclosure to the Disciplinary Board or cooperative attitude toward the proceedings, ABA Standard 9.32(e). We conclude that application of either factor would not affect our ultimate determination as to sanction, and we therefore do not address those arguments.

(2004) (imposing 30-day sanction for, among other miscon-
duct involving multiple clients, knowing failure to disclose
to a client the dismissal of the client's appeal, due to the
lawyer's negligence; lawyer had violated his duty of candor
and caused actual injury, but multiple mitigating factors
outweighed the aggravating factors).

        We have imposed sanctions closer to 60 days in
misrepresentation cases involving more serious misconduct,
as well as additional violations or aggravating factors. For
example, in *In re Spencer*, 335 Or 71, 80-81, 89, 58 P3d 228
(2002), we suspended for 60 days a lawyer who intentionally
had submitted a vehicle registration form containing a mis-
representation to help his clients illegally register a recre-
ational motor vehicle and also had failed to return another
client's documentation. Multiple aggravating factors—but
only two mitigating factors—applied. *Id.* at 86-87. Similarly,
in *Dinerman*, 314 Or at 314-16, 319, we suspended for 63
days a lawyer who acted with a dishonest motive and know-
ingly made false statements to help a client secure a bank
loan, and who took other actions to help the client engage in
fraudulent and illegal conduct. In imposing the 63-day sus-
pension, we noted a 10-year time lapse since the misconduct
had occurred with no intervening disciplinary issues (sug-
gesting that a longer sanction otherwise would have been
warranted). *Id.* at 318-19; *see also In re Magar*, 312 Or 139,
141-42, 817 P2d 289 (1991) (60-day suspension for lawyer
who had endorsed insurance proceeds check with co-payee's
name, despite knowing that the co-payee had not authorized
him to do so); *In re Greene*, 290 Or 291, 297-99, 620 P2d 1379
(1980) (60-day suspension for deliberately making misrep-
resentations (by nondisclosure) to court; this court weighed
"serious" intentional conduct against lawyer's lack of bad
motive and lack of harm to beneficiaries).

        Our review of the case law persuades us that a
30-day suspension is appropriate in this case. Respondent's
misconduct arose from a single incident, as opposed to con-
tinuing or compounding misconduct over time, and it arose
from respondent's sincere desire to act in his client's best
interests and to immediately secure financial relief that
his client undisputably needed (and to which respondent

genuinely thought that his client was legally entitled). But, respondent—an experienced civil and criminal practitioner—nonetheless chose to draft and send a demand letter to an unrepresented person that knowingly conveyed a false and urgent message threatening criminal prosecution for serious crimes. That misconduct violated respondent's duty to the legal system, harmed the legal profession, and caused actual injury.

## IV. CONCLUSION

We conclude that the Bar proved by clear and convincing evidence that respondent acted with actual knowledge when he included false and material statements in his demand letter that reflected adversely on his fitness to practice law, in violation of RPC 8.4(a)(3). We suspend respondent for 30 days.

Respondent is suspended from the practice of law for 30 days, commencing 60 days from the date of filing of this decision.